Nos. 20-35752
20-35881

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DEBRA BLAKE, et al.,

Plaintiffs-Appellees,

v.

CITY OF GRANTS PASS,

Defendant-Appellant.

Appeal from the United States District Court
for the District of Oregon, Medford (Hon. Mark D. Clarke)
Dist. Ct. No. 1:18-cv-01823-CL

## PETITION FOR HEARING *EN BANC*

Gerald L. Warren, OSB #814146
Aaron P. Hisel, OSB #161265
Law Office of Gerald L. Warren and Associates
901 Capitol St. NE
Salem, OR 97301
(503) 480-7250
gwarren@geraldwarrenlaw.com
ahisel@geraldwarrenlaw.com
Attorneys for Defendant-Appellant

May 2021

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

FRAP 35(b) STATEMENT ................................................................1

BACKGROUND ...............................................................................3

REASONS FOR GRANTING HEARING *EN BANC* ......................................6

    I.  The District Court Applied Eighth Amendment Scrutiny Under *Martin* To Individuals Who *Have* Access To Adequate Temporary Shelter.................................................................6

    II. The District Court Expanded *Martin* To Encompass A Prohibition On Initiating Civil Proceedings Against HUD Homeless Individuals For Public Camping ...............................................................8

CONCLUSION ..................................................................................13

CERTIFICATE OF COMPLIANCE (FORM 11)

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Ingraham v. Wright*, 430 U.S. 651, 97 S. Ct. 1401 (1977) .................................9

*Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) .............................*passim*

## STATUTES

42 U.S.C. § 11434(a) ............................................................................................5

## **FRAP 35(b) STATEMENT**

This case implicates issues surrounding the limits of the government's ability to move along, police, or otherwise take enforcement action against individuals camping on public property. A three-judge panel of this Court addressed some of these same issues in *Martin v. Boise*, holding that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters], the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public" because "the Eighth Amendment prohibits the imposition of criminal penalties" for such involuntary conduct. *Martin v. City of Boise*, 920 F.3d 584, 616-617 (9th Cir.. 2019), *cert. den sub nom. City of Boise, Idaho v. Martin*, 140 S. Ct. 674, 205 L Ed 2d 438 (2019) (internal quotation marks and citation omitted). Seven judges took the unusual step of either issuing or joining concurring and dissenting opinions on whether to rehear *en banc* the *Martin* decision. Judge Berzon, who authored the opinion for the three-judge panel, confirmed in her concurrence for the denial of rehearing *en banc* that "Nothing in the opinion reaches beyond criminalizing the biologically essential need to sleep when there is no available shelter." *Martin v. City of Boise*, 920 F.3d at 589. The expansionist fears of the six judges who signed onto the dissenting opinions came true with the district court's ruling in the underlying case here. *Id.* at 590-603.

The *Martin* panel explicitly <u>excluded</u> from its holding "individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Martin*, 920 F.3d at 617, n 8 (emphasis in original). Here, the district court concluded, through its interpretation and application of *Martin*, the Eighth Amendment prohibited cities from enforcing any <u>civil</u> ordinances for even the conduct of <u>camping</u> on public property, <u>regardless of the person's ability to access adequate temporary shelter</u> and redefined both homeless and available alternatives in the process. Also relying on *Martin,* the district court erred by allowing plaintiffs to proceed as a broad class that by definition included sheltered and unsheltered individuals under HUD's (United States Department of Housing and Urban Development) definition of homeless. The district court's failure to decertify the class and analyze plaintiffs' purely prospective claims *individually* led to further errors, including holding that initiating civil proceedings against class members (including those with access to adequate temporary shelter) for camping on public property violated the Eighth Amendment. (Add-023).

A hearing *en banc* is warranted to correct the district court's expansion of *Martin v. Boise* and to clarify the scope of that holding. The issues surrounding the limits on use of public places have impacted all citizens and municipalities in

the Ninth Circuit. An *en banc* examination of the district court's application of the *Martin* holding is exceptionally important to local governments within this Court's jurisdiction who daily strive to humanely and creatively alleviate issues in ways that fit the unique situations and individuals in their respective jurisdictions. The City of Grants Pass's efforts to allow for sleeping but distinguish that from the conduct of *camping* for extended periods in the same place is a perfect example of what the district court has now deemed *prospectively* in violation of the Eighth Amendment per *Martin.* This Court should hear this matter *en banc*, and ultimately reverse the district court's grant of summary judgment to plaintiffs, revoke class certification and remand this case for entry of judgment in the City's favor.

## BACKGROUND

The City of Grants Pass is located in southwestern Oregon and has a population of approximately 38,000. (Add-004). On January 2, 2019, in direct response to the holding in *Martin v. Boise*, the City amended its "Camping in Parks" ordinance (GPMC 6.46.090) to clarify that "sleeping" was to be distinguished from the conduct of "camping." [1] (2-ER-276-296) (including

---

[1] 5.61.010 Definitions A. "To Camp" means to set up or to remain in or at a campsite. B. "Campsite" means any place where bedding, sleeping bag, or other material used for bedding purposes, or any stove or fire is placed, established, or maintained for the purpose of maintaining a temporary place to live, whether or

transcript of public hearing and ordinance amendments made). The City's intent to apply the appropriate balancing of the constitutional concerns in *Martin* with the City's legitimate interests in protecting the health, safety, and welfare of all citizens was obvious. (2-ER-276-296). The City ensured that its enforcement practices allowed individuals to engage in the involuntary acts of sleeping and resting but maintained a prohibition on the voluntary conduct of remaining indefinitely at an established "campsite" in the parks as a "place to live," or sleeping in pedestrian and vehicular rights of way. *Id.*

On October 15, 2018, just a month after the three-judge panel originally issued its opinion in *Martin*, plaintiffs filed this claim for prospective relief, alleging the City's post-*Martin* enforcement of its sleeping and camping ordinances violated the Eighth and Fourteenth Amendments as applied to homeless individuals. (3-ER-469-483). The operative Third Amended Complaint was filed on November 13, 2019. (3-ER-412-430). Plaintiffs sought and obtained class certification for homeless individuals in and around Grants Pass, based on a broad HUD definition of homeless.[2] (1-ER-46-47). Even those living in the

---

not such place incorporates the use of any tent, lean-to, shack, or any other structure, or any vehicle or part thereof. (1-ER-044).

[2] Plaintiffs contend there are "602" homeless individuals in Grants Pass using the "HUD and McKinney Vento definitions" of homeless. (ECF 42, ¶¶ 5-6). These definitions derive from federal regulations related to who can apply for and receive certain government assistance benefits. 24 C.F.R. § 582.5 (HUD

very shelters plaintiffs assert the City must provide, or individuals living with roommates due to "economic hardship" remain homeless as defined by HUD, and therefore, remain class members exempt from the City's camping ordinances under the district court's opinions. This cannot be how the *Martin* panel intended the law to be applied.

The parties filed cross-motions for summary judgment. (ECF 62-110). On July 22, 2020, the court issued its Opinion and Order, granting in part and denying in part plaintiffs' Motion for Summary Judgment and denying the City's Motion for Summary Judgment. (Add-035). The court asserted that *Martin v. Boise* is controlling precedent yet failed to analyze the City's post-*Martin* enforcement practices before holding the City's relevant ordinances violated both the cruel and unusual punishment clause and the excessive fines clause of the Eighth Amendment "as-applied" to the class. *Id.* The court commended the City's "attempt to comply with *Martin*" (by differentiating between sleeping and

definition, which also includes the additional definitions found in seven other pieces of legislation, including 42 U.S.C. § 11434a, the McKinney-Vento Act definition). These definitions of homeless include various categories of people who have no need to sleep or camp on public property and no need to be exempted from any of the City's ordinances. *Id.* (e.g. anyone who has shelter that is not "fixed [and] regular"; anyone in a private or public shelter; any "unaccompanied" individual under 25 years of age; anyone with a roommate due to "economic hardship"; anyone living in a trailer park for lack of a better option; residents of transitional housing, etc.).

camping) but reasoned that the City still *prospectively* violated the Eighth Amendment because class members remained at *risk* of having facially valid laws enforced against them, despite plaintiffs' failure to show *any* unconstitutional enforcement under even *Martin's* standards as to any class member. (Add-012-013).

The court rejected the City's arguments that its ordinances are constitutional, its ordinances are being enforced constitutionally, the Eighth Amendment does not apply before a person has been "punished" in these circumstances, and it would be inappropriate to determine whether a punishment was unconstitutionally cruel, or a fine excessive, on a class wide as-applied basis under *Martin*. (ECF 50, pp. 19-37). An *en banc* panel of this Court should correct these errors.

## REASONS FOR GRANTING THE HEARING *EN BANC*

I.  The District Court Applied Eighth Amendment Scrutiny Under *Martin* To Individuals Who *Have* Access To Adequate Temporary Shelter

The *Martin* panel held that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]," the jurisdiction cannot prosecute homeless individuals for "involuntarily sitting, lying, and sleeping in public." *Martin*, 920 F.3d at 617 (internal quotation marks and citation omitted). However, the Court added a

crucial exception to its holding that was ignored by plaintiffs and the district court:

> Naturally, our holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it.

(emphasis in original). *Id.* at n 8. Accordingly, under *Martin*, a person is "involuntarily sitting, lying, and sleeping in public" and protected from criminal prosecution for such conduct when they have "no option of sleeping indoors" because their conduct in such circumstances becomes inseparable from their status as an unsheltered homeless individual. *Id.* at 617.

Determining whether a person is involuntarily homeless or has the "option" of sleeping indoors under *Martin* requires a two-step analysis: (1) determine whether there are a greater number of homeless individuals than available shelter beds in the jurisdiction; and, if so, (2) determine whether the individual has "access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it."

As explained above, the district court erred by determining *all* HUD homeless class members are involuntarily homeless individuals with legal standing simply because there is a greater number of homeless individuals in Grants Pass than HUD certified shelter beds – regardless of whether the

individuals "have access to adequate temporary shelter." [3] The court erred by disregarding the need to determine *individually* whether a person had the ability to access adequate temporary shelter before applying *Martin*'s inherently flawed Eighth Amendment "formula" based scrutiny to an entire class of both sheltered and unsheltered individuals. This error tainted the entire proceedings. Under *Martin*, Eighth Amendment scrutiny is *not* applied to individuals with access to adequate temporary shelter. To the extent that was the intent of the *Martin* panel, this court should take this opportunity to overrule and/or clarify the *Martin* opinion for all.

II.   The District Court Expanded *Martin* To Encompass A Prohibition On Initiating Civil Proceedings Against HUD Homeless Individuals For Public Camping

The *Martin* panel narrowly held that "as long as there is <u>no option of sleeping indoors</u>, the government cannot <u>criminalize</u> indigent, homeless people for <u>sleeping</u> outdoors, on public property, on the false premise they had a choice in the matter." 920 F.3d at 617 (emphasis added). Judge Berzon, in her concurrence in the denial of rehearing *en banc*, reaffirmed that "[n]othing in the

---

[3] The district court also erred by requiring shelters in Grants Pass be "HUD certified" to qualify as shelters under *Martin*. (Add-014) (The Gospel Rescue Mission that offers year-round shelter for class members but "cannot be included in the mathematical ratio of homeless people to shelter beds because [it] lost its designation as a HUD certified emergency shelter."). Plaintiffs and the district court failed to show a shelter must be HUD certified to count as shelter in the *Martin* formula.

opinion reaches beyond <u>criminalizing</u> the biologically essential need to <u>sleep</u> when there is <u>no available shelter</u>." *Id*. at 589 (emphasis added). Contrary to the language of the opinion itself and Judge Berzon's clarifying remarks on the petition for rehearing *en banc*, the district court here held if there are not enough <u>HUD certified shelter beds</u> to accommodate every HUD homeless individual in a jurisdiction, the government cannot even <u>initiate civil proceedings</u> against an individual for <u>maintaining a campsite</u> on public property without violating the Eighth Amendment. (1-ER-019).

The *Martin* panel did not address the application of the Eighth Amendment to *civil* proceedings. The Court found that under *Ingraham*, "[f]or those rare Eighth Amendment challenges concerning the state's very power to <u>criminalize</u> particular behavior or status, then, a plaintiff need demonstrate only the initiation of the <u>criminal</u> process against him, not a conviction." *Martin*, 920 F.3d at 614 (citing *Ingraham v. Wright*, 430 U.S. 651, 97 S. Ct. 1401 (1977)). This reasoning does not reasonably apply to the present case where plaintiffs seek only prospective relief from the initiation of *civil* proceedings enforcing facially constitutional ordinances. If this is what *Martin* intended, officers risk violating the Eighth Amendment every time they enforce a public health law because they cannot reasonably differentiate between those whose actions qualify as protected "status" and those whose actions constitute punishable "conduct." It must be –

under these circumstances – constitutional under the Eighth and Fourteenth Amendments for an officer to initiate a civil proceeding with the simple act of issuing a ticket based on probable cause and a court to determine whether any penalty should be imposed because it runs afoul of the Eighth Amendment or otherwise – as is the process for every citizen. A hearing *en banc* is warranted to determine if it is cruel and unusual punishment to issue a citation to a person for camping in public, even when the City's practices and ordinances require multiple prior warnings and the passage of time to ensure the infraction is not simply sleeping but instead actual *camping* on public property.

This issue is critical to all jurisdictions because the district court determined "camping" qualifies as inseparable from the *status* of being "HUD homeless" and, therefore, also constitutionally protected despite there being no evidence to support such an interpretation. (Add-013) (holding without any evidence that any such punishment had been taken that "[m]aintaining a practice where the City allows a person to 'sleep' on public property, but punishes him as a 'camper' if he so much as uses a bundled up item of clothing as a pillow, is cruel and unusual punishment."). This is direct contrast to the enforcement practices and ordinances being evaluated by the *Martin* panel.

> It appears from the record that the Camping Ordinance is frequently enforced against homeless individuals with some elementary bedding, whether or not any of the other listed indicia of "camping" — the erection of temporary structures, the activity of cooking or

> making fire, or the storage of personal property — are present. For example, a Boise police officer testified that he cited plaintiff Pamela Hawkes under the Camping Ordinance for sleeping outside "wrapped in a blanket with her sandals off and next to her," for sleeping in a public restroom "with blankets," and for sleeping in a park "on a blanket, wrapped in blankets on the ground." The Camping Ordinance therefore can be, and allegedly is, enforced against homeless individuals who take even the most rudimentary precautions to protect themselves from the elements.

920 F.3d at 618. Again, nothing of the sort is in the record of this case.

If appropriating public property for camping is life-sustaining conduct, inseparable from one's status as HUD homeless, such reasoning means that *any* life-sustaining conduct by a HUD homeless person is protected status – public urination, defecation, littering – and cannot be prohibited through criminal *or* civil laws, even against those with access to shelter. While stating that these other violations are part of the "large toolbox" of options jurisdictions still have, the district court's Order would logically prevent municipalities from enforcing any type of public health and safety laws against anyone who is HUD homeless, even if that is undeterminable at the time of officer contact.[4] Under the district court's opinions, the officer already violated the person's Eighth Amendment rights by

---

[4] The district court disingenuously proffers that its "holding does not limit Grants Pass' ability to enforce laws that actually further public health and safety, such as laws restricting littering, public urination or defecation, … possession or distribution of illicit substances…." (Add-031). Yet, applying the district court's logic, this is precisely what the court's holding limits, because those things are just as "inseparable" from being homeless as "camping."

merely *citing* him or her, because of knowledge he could not ascertain at the time, if it is later determined that at the time of contact the person fit any of the HUD's broad categories of "homeless." This cannot be how the law works.

It does not take much imagination to see that a litany of "conduct" is arguably "inseparable" from one's status as HUD homeless and cannot be lawfully prohibited under the district court's Order, including theft, burglary for the purpose of shelter, theft of food, theft of clothing, robbery for medication; public intoxication (if the person is also an alcoholic); and public drug use (if the person is also a drug addict). It is nonsensical and unworkable for a jurisdiction to be required to treat some citizens differently, including exempting them from facially valid laws, on the bases of inclusion in something as amorphous as their "status" of being "HUD homeless." The type of blanket "as applied" exemption from even being cited for facially valid laws the district court created does not and should not exist. The subsequent due process and courts, not officers, are positioned to judge whether an individual in any given situation is legally entitled to immunity from certain laws. Under the district court's Order the City cannot issue any citation to "the class" under any circumstances because the moment the ticket is issued some form of Eighth Amendment "punishment" has occurred. An *en banc* panel of this Court should clarify and reject these erroneous conclusions.

## <u>CONCLUSION</u>

A hearing *en banc* is appropriate here where a rejection of, or at least a thorough explanation of *Martin*'s scope, is essential to local governments in the Ninth Circuit. Citizens and local officials must be able to understand whether *Martin's* flawed formula-based holding is consistent with the law and, if so, whether it reaches beyond criminalizing the biologically essential need to sleep. The district court, asserting that it was relying directly on *Martin* and its logic, concluded *Martin* included preventing local governments from issuing civil citations for *any* conduct "inseparable" from being HUD homeless, including indefinitely maintaining campsites, when *HUD certified* shelter is not available to every HUD homeless individual in a jurisdiction. Under this regime, even those that are housed in a non-HUD certified homeless shelter, remain exempt from public camping laws. Clarity, from an *en banc* panel of this Court, is vital to maintaining a functioning society.

DATED this 5th day of May, 2021.

Respectfully submitted,

_____s/ Aaron P. Hisel_____
Gerald L. Warren, OSB #814146
Aaron P. Hisel, OSB #161265
Attorneys for Defendant-Appellant

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing or Answers

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** | 20-35752, 20-35881

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing/petition for rehearing en banc/answer to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: 3,088 .

*(Petitions and answers must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Aaron P. Hisel     **Date** | May 5, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                        *Rev. 12/01/2018*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

I.      Opinion and Order (Dkt. 111) ....................................................... Add-001

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

DEBRA BLAKE, GLORIA JOHNSON,
JOHN LOGAN, individuals, on behalf of
themselves and all others similarly situated,

                Plaintiffs,

       v.

CITY OF GRANTS PASS,

                Defendant.

Case No. 1:18-cv-01823-CL

OPINION AND ORDER

CLARKE, Magistrate Judge.

      This case involves a certified class of homeless individuals residing in and around Grants

Pass, Oregon. The class members allege that the City of Grants Pass has a web of ordinances,

customs, and practices that, in combination, punish people based on their status of being

involuntarily homeless. This case comes before the Court on cross-motions for summary

judgment. The Court has also considered amicus briefs submitted by League of Oregon Cities

and the National Law Center on Homelessness and Poverty. For the reasons below, Plaintiffs'

Motion for Summary Judgment (Dkt. No. 62) is GRANTED in part and DENIED in part, and

Defendant's Motion for Summary Judgment (Dkt. No. 80) is DENIED.[1]

## STANDARD OF REVIEW

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material facts and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving

party has the initial burden of showing that no genuine issue of material fact exists. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001) (en banc). The court cannot weigh the evidence or determine the truth but may only

determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796,

800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to

the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at

250. Conclusory allegations unsupported by factual material are insufficient to defeat a motion

for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the

opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether

a party has met its burden, the court views the evidence in the light most favorable to the non-

moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

---

[1] The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

## BACKGROUND

This case is about respecting the dignity of homeless individuals and the City of Grants Pass' ability to protect the safety and welfare of its citizens. Unsheltered homelessness is an ever-growing crisis nationwide, and the overwhelming majority of homeless individuals are not living that way by choice. According to the United States Department of Housing and Urban Development ("HUD"), there were an estimated 533,000 homeless individuals in the United States in 2018; more than a third of whom were "unsheltered homeless," meaning, individuals "whose primary nighttime location [wa]s a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, . . . or camping ground."[2] HUD's figures are obtained using what is known as a "point-in-time" or "PIT" count, which, as its name suggests, is arrived at by counting the number of people in a city or county who are homeless on a particular night.[3] HUD requires local homelessness assistance and prevention networks to conduct a PIT count each year as a condition of federal funding. A 2001 administrative study found that the true size of a homeless population may be anywhere between 2.5 to 10 times larger than what can be estimated by a PIT count.[4] As the Ninth Circuit recognized in *Martin v. City of Boise*, there are many reasons for this undercount:

> It is widely recognized that a one-night point in time count will undercount the homeless population, as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers and the number of homeless people staying at shelters or accessing services on the night of the count.

---

[2] National Law Center on Homelessness & Poverty, *Housing Not Handcuffs 2019: Ending the Criminalization of Homelessness in U.S. Cities* 28 n. 15 (2019), http://nlchp.org/wpcontent/uploads/2019/12/HOUSING-NOT-HANDCUFFS-2019-FINAL.pdf [hereinafter *Housing Not Handcuffs*].
[3] *Id.* at 28.
[4] *Id.*

920 F.3d 584, 604 (9th Cir.), *cert. denied sub nom. City of Boise, Idaho v. Martin*, 140 S. Ct. 674, (2019).

To combat the homeless crisis, many local governments have created ordinances—such as the ones challenged by Plaintiffs in this case—that ban "camping" or similar activities in all or parts of a city. These ordinances are often referred to as "quality of life laws."[5] Enforcing quality of life laws is an expensive endeavor nationwide. For example, the City of Los Angeles spends $50 million annually policing criminal and civil quality of life laws.[6] By contrast, the City of Los Angeles spends only $13 million on providing housing and services to the country's largest homeless population.[7] Likewise, a Seattle University study found that the cost to the City of Seattle for enforcing just one of its six quality of life laws was $2.3 million over five years.[8]

The City of Grants Pass, Oregon, the city involved in this case, had a population of 23,000 people according to the 2000 census, and it is now estimated to have more than 38,000 people.[9] The development of affordable housing in Grants Pass has not kept up with the population growth. City Manager Aaron Cubic confirmed in his deposition that Grants Pass has a vacancy rate of 1% and that "essentially means that there's no vacancy." Edward Johnson Decl., Ex. 1, Cubic Depo. at p. 49, lines 1-10 (Dkt. #63-1). Kelly Wessels, the Chief Operating Officer of the Community Action Agency that serves Grants Pass testified that "Grants Pass'

---

[5] *See* Joshua Howard et al., *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane,* HOMELESS RIGHTS ADVOCACY PROJECT 10 (2015), https://digitalcommons.law.seattleu.edu/hrap/10.

[6] Gale Holland, *L.A. Spends $100 Million a Year on Homelessness, City Report Finds*, LOS ANGELES TIMES, Apr. 16, 2015, https://www.latimes.com/local/lanow/la-me-ln-homeless-caoreport-20150416-story.html.

[7] *Housing Not Handcuffs*, *supra* note 2, at 71.

[8] *See* Joshua Howard et al., *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane,* HOMELESS RIGHTS ADVOCACY PROJECT iii (2015), https://digitalcommons.law.seattleu.edu/hrap/10.

[9] http://worldpopulationreview.com/us-cities/grants-passor-population/.

stock of affordable housing has dwindled to almost zero. Landlords routinely require an

applicant to have an income that is three times the monthly rent. Rental units that cost less than

$1,000/month are virtually unheard of in Grants Pass." Kelly Wessels Decl. ¶ 7 (Dkt. #42).

A point-in-time count of homeless individuals was conducted by the United Community

Action Network ("UCAN") on January 30, 2019, in Grants Pass. UCAN counted 602 homeless

individuals in Grants Pass. Wessels Decl. ¶ 6 (Dkt. #42). Another 1,045 individuals were

counted as "precariously housed," meaning that they were sleeping at the home of somebody

else, or "couch surfing." *Id.*

In March 2013, the Grants Pass City Council hosted a Community Roundtable,

hereinafter referred to as the "2013 Roundtable Meeting," to "identify solutions to current

vagrancy problems." Wessels Decl. ¶ 8, Ex. 1 (minutes of public roundtable) (Dkt #65).

Minutes from this meeting show that the City Council President stated, "the point is to make it

uncomfortable enough for them in our city so they [referring to homeless individuals] will want

to move on down the road." Wessels Decl., Ex. 1 at 2 (Dkt. #65-1). At the end of the meeting, a

list of "actions to move forward on" was created. These action items included (i) ways to

increase police presence downtown; (ii) create an exclusion zone and possibly have a blanket

trespassing regulation; (iii) specific amount of misdemeanors leading to prosecution; (iv) not

feeding in parks or other specific areas in the city; (v) posting "zero tolerance" signs stating

certain ordinances will be strictly enforced; (vi) look into the possibility of creating a "do not

serve" or "most unwanted" list; (vii) pass out the trespassing letters and get word out to have

them signed; and (viii) provide assistance in constructing safe areas at agencies to protect

volunteers from aggressive behavior. *Id.* at 13. City Manager Aaron Cubic confirmed that the

action items from the 2013 Roundtable Meeting were copied into the City's strategic plans in the

form of an objective to "address the vagrancy issue" starting with the 2013-14 Grants Pass

Strategic Plan up to the current 2019 Grants Pass Strategic Plan.  Edward Johnson Decl., Ex. 1,

Cubic Depo. at p. 29 lines 11-16; p. 46 line 20 to p. 48 line 10. (Dkt. #63-1).  The City Manager

also confirmed that one of the action items related to this objective was the "targeted

enforcement of illegal camping."  *Id.* at p. 36 line 16 to p. 37 line 5.

  There are no homeless shelters in Grants Pass that qualify as "shelters" under the criteria

provided by HUD.  The housing option cited by the City that most resembles a shelter is the

Gospel Rescue Mission ("GRM"), which operates transitional housing programs in Grants Pass.

GRM Director of Resident Services, Brian Bouteller, testified that GRM offers 30-day

transitional housing in two facilities: one facility is for women and children with capacity for 60

people and the other for men with 78 spaces.  Edward Johnson Decl., Ex. 2, Bouteller Depo. p.

18 lines 10-15 (Dkt. #63-2).  There is no program for men with children or unaccompanied

minors.  *Id.* at Bouteller Depo. p. 19, lines 5-8.  Homeless individuals in these programs are

required to work six-hour days, six days a week in exchange for a bunk for 30 days.  *Id.* at

Bouteller Depo. p. 48 line 23-p. 51 line 5.  During this 30-day period, people are not permitted to

look for outside work.  *Id.* at Bouteller Depo. at p. 51 line 25-p. 52 line 4.  It is mandatory that

GRM residents attend a traditional Christian Chapel twice a day and go to a Christian Church

that follows the Nicene and Apostle's Creed every week.  *Id.* at Bouteller Depo. at p. 33 line 10-

p. 35 line 3.  Before a person is considered for admission at GRM, they must agree to comply

with a lengthy list of rules.  For example, if you have serious or chronic medical or mental health

issues that prevent you from participating in daily GRM life, you may not be able to stay at the

GRM; you are to remain nicotine free during your stay at GRM; all intimate relationships other

than legal/biblical marriage, regardless of gender, either on or off Mission property are strictly

forbidden. Edward Johnson Decl., Ex 3 (Dkt. #63-3). GRM has avoided seeking government funding so that it can maintain these restrictive rules. Johnson Decl., Ex 2, Bouteller Depo. p. 15 lines 15-23 (Dkt. #63-2).

The class of involuntarily homeless people living in and around Grants Pass, Oregon was certified by this Court on August 7, 2019. (Dkt. #47). The class is defined as all involuntarily homeless individuals living in Grants Pass, Oregon, including homeless individuals who sometimes sleep outside city limits to avoid harassment and punishment by Defendant City of Grants Pass as addressed in this lawsuit. The class representatives allege that each of their situations fall under the definition of homelessness adopted by HUD. 24 C.F.R § 582.5 (2012). HUD's definition encompasses a variety of living situations, including youth homelessness, *id.* § 582.5(3); individuals fleeing domestic violence, *id.* § 582.5(4); individuals "living in a supervised publicly or privately operated shelter designed to provide temporary living arrangements," *id.* § 582.5(1)(ii); and individuals whose primary nighttime residence "is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, or camping ground, *id.* § 582.5(1)(i).

Class representatives allege that their situations are just three representations of modern homelessness in the United States. Class representative, Debra Blake, lost her job and housing approximately ten years ago and has been involuntarily homeless in Grants Pass ever since. Blake Decl. ¶ 3 (Dkt. #90). At the time of class certification, Ms. Blake was living in temporary transitional housing, but her ninety-day stay expired and she has returned to sleeping outside. As recently as September 11, 2019, Ms. Blake was cited for illegal camping and "prohibited conduct" in Riverside Park in Grants Pass because she was laying in the park in a sleeping bag at 7:30 a.m. *Id.* ¶ 7. Ms. Blake was convicted and fined $590. Later that same morning, the same

officer wrote Ms. Blake a citation for "criminal trespass on City property" with an associated fine of $295. *Id.* Ms. Blake was also issued a park exclusion on September 11, 2019. *Id.* ¶ 8. Ms. Blake filed an appeal and the exclusion was lifted without explanation after she had already been excluded from all Grants Pass parks for two weeks. *Id.* Currently, Ms. Blake owes the City over $5,000 in unpaid fines related to enforcement of the ordinances at issue while living outside in Grants Pass. Class representative, John Logan, has been intermittently homeless in Grants Pass for the last ten years. Mr. Logan currently sleeps in his truck at a rest stop north of Grants Pass because he fears being awakened and ticketed if he sleeps in his truck within the City. Logan Decl. ¶ 2 (Dkt. #67). Mr. Logan is a licensed home care provider and his clients have allowed him to sleep on a mattress in a room they use for storage approximately four to five nights a week. *Id.* ¶ 3. However, that job ended in October or November 2019. *Id.* Class representative, Gloria Johnson, has been living out of her van since at least before this litigation began. Johnson Decl. ¶ 2 (Dkt. #91). Ms. Johnson has parked her van to sleep outside of town on both BLM land and county roads. She claims that she has been asked to move along several times. *Id.* ¶¶ 3-5. While their exact circumstances and stories may vary, the three class representatives all share the need to conduct the life sustaining activities of resting, sleeping, and seeking shelter from the elements while living in Grants Pass without a permanent home.

Through their appointed class representatives, Plaintiffs move for summary judgment on each of their claims. Plaintiffs allege that the City of Grants Pass, through a combination of ordinances, customs, and policies, has unconstitutionally punished them for conducting life-sustaining activities and criminalized their existence as homeless individuals. Plaintiffs seek an order from this Court declaring that the City's enforcement of Grants Pass Municipal Codes ("GPMC") 5.61.020 (the "anti-sleeping ordinance"); GPMC 5.61.030 and GPMC 6.46.090 (the "anti-camping ordinances"), GPMC 6.46.350 (the "park exclusion ordinance") and criminal trespass laws stemming from violations of those ordinances are unconstitutional as applied to the

plaintiff class. Plaintiffs also seek an injunction prohibiting the City from enforcing those ordinances and related criminal trespass laws against the plaintiff class unless and until members of the class have the opportunity to obtain shelter within the City.  The exact language of the ordinances at issue are as follows:

### 5.61.010 Definitions
A. "To Camp" means to set up or to remain in or at a campsite.
B. "Campsite" means any place where bedding, sleeping bag, or other material used for bedding purposes, or any stove or fire is placed, established, or maintained for the purpose of maintaining a temporary place to live, whether or not such place incorporates the use of any tent, lean-to, shack, or any other structure, or any vehicle or part thereof.

### 5.61.020 Sleeping on Sidewalks, Streets, Alleys, or Within Doorways Prohibited
A. No person may sleep on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety.
B. No person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk.
C. In addition to any other remedy provided by law, any person found in violation of this section may be immediately removed from the premises.

### 5.61.030 Camping Prohibited
No person may occupy a campsite in or upon any sidewalk, street, alley, lane, public right of way, park, bench, or any other publicly-owned property or under any bridge or viaduct, unless (i) otherwise specifically authorized by this Code, (ii) by a formal declaration of the City Manager in emergency circumstances, or (iii) upon Council resolution, the Council may exempt a special event from the prohibitions of this section, if the Council finds such exemption to be in the public interest and consistent with Council goals and notices and in accordance with conditions imposed by the Parks and Community Services Director. Any conditions imposed will include a condition requiring that the applicant provide evidence of adequate insurance coverage and agree to indemnify the City for any liability, damage or expense incurred by the City as a result of activities of the applicant. Any findings by the Counsel shall specify the exact dates and location covered by the exemption.

### 6.46.090 Camping in Parks

A. It is unlawful for any person to camp, as defined in GPMC Title 5, within the boundaries of the City parks.

B. Overnight parking of vehicles shall be unlawful. For the purposes of this section, anyone who parks or leaves a vehicle parked for two consecutive hours or who remains within one of the parks as herein defined for purposes of camping as defined in this section for two consecutive hours, without permission from the City Council, between the hours of midnight and 6:00am shall be considered in violation of this Chapter.

### 6.46.350 Temporary Exclusion from City Park Properties

An individual may be issued a written exclusion order by a police officer of the Public Safety Department barring said individual from all City Park properties for a period of 30 days, if within a one-year period the individual:

A. Is issued 2 or more citations for violating regulations related to City Park properties, or

B. Is issued one or more citations for violating any state law(s) while on City Park property.

Plaintiffs also challenge the appeal process for park exclusions as violating their procedural due process rights. The language detailing the appeal procedures are found in GPMC 6.46.355:

### 6.46.355 Appeal and Hearing

If the individual who is issued a written exclusion order files a written objection to the exclusion with the City Manager within 2 business days, the matter shall be placed on the City Council's agenda not earlier than 2 days after receiving the objection. The objection may be heard by the Council at its discretion at a regular meeting, at a Council workshop, or at a special meeting. The exclusion order shall remain in effect pending the hearing and decision of the Council. At the hearing the staff shall provide the Council with information regarding the exclusion order and the individual shall be allowed to present relevant evidence. The staff shall have the burden of proof by a preponderance of evidence.

The two camping ordinances carry a mandatory fine of $295. The fine for illegal sleeping is $75. GPMC 1.36.010. When unpaid, the fines increase to $537.60 and $160 respectively due to "collection fees." Johnson Decl., Ex. 9 at 5-6 (Dkt. #63-9). Plaintiffs were provided 615 citations and 541 incident reports issued pursuant to three of these ordinances:

GPMC 5.61.020 (the anti-sleeping ordinance), GPMC 5.61.030 (the anti-camping ordinance), GPMC 6.46.090 (the anti-camping in parks ordinance). Inessa Wurscher Decl. ¶¶ 4-5 (Dkt. #64). Of the 615 tickets, 313 were for illegal sleeping, 129 were for illegal camping in the parks and 182 were for illegal camping. *Id.* ¶ 5 (some citations were for more than one offense). The number of citations rose from 24 tickets in 2012 to 228 tickets in 2014, a significant increase following the 2013 Roundtable Meeting. *Id.*

## DISCUSSION

**I.    Grants Pass' policy and practice of punishing homelessness violates the Cruel and Unusual Punishment Clause of the Eighth Amendment.**

### a.    *Martin v. Boise* is controlling precedent.

The United States Constitution prohibits punishing people for engaging in unavoidable human acts, such as sleeping or resting outside when they have no access to shelter. *Martin v. Boise*, 920 F.3d 584 (9th Cir. 2019) *cert. denied* 2019 U.S. LEXIS 7571 (Dec. 16, 2019). In *Martin*, the Ninth Circuit held that "so long as there is a greater number of homeless individuals in [a city] than the number of available beds [in shelters]," a city cannot punish homeless individuals for "involuntarily sitting, lying, and sleeping in public." *Id.* at 617. That is, as long as there are no emergency shelter beds available to homeless individuals, "the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id.* (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated on other grounds*, 505 F.3d 1006 (9th Cir. 2007)).

*Martin* is binding precedent on this Court. In *Martin*, six plaintiffs who were or had recently been homeless residents of Boise, Idaho challenged two city ordinances that punished homeless people for sleeping or camping in public spaces. The Boise "camping ordinance" prohibited and punished the "use of 'any streets, sidewalks, parks, or public places as a camping

place at any time.'" *Id.* at 603. Camping was defined as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence." *Id.* at 603-604. The Boise "disorderly conduct ordinance" prohibited "occupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof." *Id.* at 604.

In this case, Grants Pass' two anti-camping ordinances prohibit "occupying a campsite" on "any publicly-owned property" in the City of Grants Pass. GPMC 5.61.030; GPMC 6.46.090. "Campsite" is defined as "any place where bedding, sleeping bag, or other material used for bedding purposes . . . is placed . . . for the purpose of maintaining a temporary place to live." GPMC 5.61.010(B). The camping ordinances apply to all public spaces in Grants Pass at all times, including parks. The camping ordinances also prohibit anyone from sleeping in their cars for two consecutive hours within any Grants Pass park parking lot between the hours of midnight and 6:00 a.m. GPMC 6.46.090(B). The anti-sleeping ordinance prohibits sleeping "on public sidewalks, streets, or alleyways at any time . . . ." GPMC 5.61.020. Additionally, "[n]o person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk." *Id.* These ordinances, in combination, prohibit individuals from sleeping in any public space in Grants Pass while using any type of item that falls into the category of "bedding" or is used as "bedding."

Grants Pass takes the position that *Martin* simply confirms that a city cannot criminalize the unavoidable act of sleeping outside when there are not enough shelter beds available. Grants Pass argues that the City amended its anti-camping ordinances to remove the word "sleeping" after *Martin.* On January 2, 2019, the City amended GPMC 6.46.090 by removing the word "sleeping" so that the act of "sleeping" was to be distinguished from the prohibited conduct of

"camping" under the City's Camping in the Parks Ordinance. Aaron Hisel Decl. ¶¶ 12, 13, Exs. 11, 12 (Dkt. #81) . The City's intent for making this change "was to make it clear that those without shelter *could* engage in the involuntary acts of sleeping or resting in the City's parks but would still be prohibited from the voluntary conduct of maintaining a 'campsite' in the parks as a 'place to live.'" Defendant's Motion at 35 (Dkt. #80) (emphasis in original). The Court appreciates the City's attempt to comply with *Martin*. However, Grants Pass ignores the basic life sustaining need to keep warm and dry while sleeping in order to survive the elements. Under the Grants Pass ordnances, if a homeless person sleeps on public property with so much as a flattened cardboard box to separate himself from the wet cold ground, he risks being punished under the anti-camping ordinance. Grants Pass cannot credibly argue that its ordinances allow sleeping in public without punishment when, in reality, the only way for homeless people to legally sleep on public property within the City is if they lay on the ground with only the clothing on their backs and without their items near them. That cannot be what *Martin* had in mind. Maintaining a practice where the City allows a person to "sleep" on public property, but punishes him as a "camper" if he so much as uses a bundled up item of clothing as a pillow, is cruel and unusual punishment. Therefore, this Court finds that it is not enough under the Eight Amendment to simply allow sleeping in public spaces; the Eight Amendment also prohibits a City from punishing homeless people for taking necessary minimal measures to keep themselves warm and dry while sleeping when there are no alternative forms of shelter available.

As was the case in *Martin,* Grants Pass has far more homeless people than "practically available" shelter beds. In *Martin,* the Ninth Circuit's math reflected 867 homeless individuals in Ada County Idaho (an unknown number in Boise) while Boise had 354 emergency shelter beds and 92 overflow mats. *Martin* 920 F.3d at 604, 606. On January 30, 2019, the Point in

Time Count[10] in Grants Pass counted 1,673 unduplicated individuals, 602 of whom were

"homeless" and the rest of whom were "precariously housed or doubled up." Wessels Decl. ¶¶

5-6 (Dkt. #42). The mathematical ratio in the record as it currently stands is 602 homeless

people (with another 1,071 on the verge of homelessness) in Grants Pass and, on the other side of

the ledger, zero emergency shelter beds. The numbers here are clear, overwhelming, and

decisive.

The Gospel Rescue Mission ("GRM") is the only entity in Grants Pass that offers any

sort of temporary program for some class members year-round. However, GRM cannot be

included in the mathematical ratio of homeless people to shelter beds because GRM has lost its

designation as a HUD certified emergency shelter. Wessels Decl. ¶ 12 (Dkt. #29). GRM is also

considerably less accessible than even the shelters in *Martin* because it does not offer temporary

emergency shelter and has substantial religious requirements and other restrictive rules. GRM

does not offer "emergency shelter," only a "30-day Residential Program." Bouteller Depo. p. 27

lines 11-18. This program offers extended stays and is more akin to a transitional housing

program than a homeless shelter. Bouteller Depo. p. 18 lines 10-15; Wessels Decl. ¶ 12 (Dkt.

#29). Additionally, there are several strict rules for residents of GRM, including remaining

nicotine free while on or off the premises and mandatory attendance to Christian church and

other church affiliated activities. Even without these rules, GRM's 138 beds would not be nearly

enough to accommodate the at least 602 homeless individuals in Grants Pass.

Grants Pass argues that Plaintiffs have alternative "realistically available" shelter outside

the City on federal BLM land, Josephine County land, or state rest stops. This remarkable

---

[10] The Ninth Circuit in *Martin* also used PIT Counts to determine the number of homeless people in the
area and commented that PIT Counts typically undercount the homeless population in a community
because of difficulty in locating people, weather and volunteer issues. *Martin* at 604.

argument not only fails under *Martin*, but it also sheds light on the City's attitude towards its homeless citizens. Essentially, Grants Pass argues that it should be permitted to continue to punish its homeless population because Plaintiffs have the option to just leave the City. The City's suggestion that because it is geographically smaller than Boise or other cities, it should be allowed to drive its homeless population onto "nearby" federal, state, or Josephine County land, is not supported by *Martin*. Additionally, the record does not support the suggestion that homeless people are welcome to live without interruption by law enforcement at these locations. BLM land is available for recreational camping, not as a space for emergency shelter. Fed. Reg. Vol. 70, No. 159 (Aug. 18, 2005). The campsites cost money. Aaron Hisel Decl., Ex. 1 at 52 (Dkt. #81-1). Living, establishing occupancy, or using this land for "residential purposes" is specifically prohibited, and there are limits on how long a person can stay. Fed. Reg. Vol. 70, No. 159; *See also* Gloria Johnson Decl. ¶¶ 3-5; Blake Decl. ¶ 15. Homeless people who attempt to live on BLM land are subject to trespass prosecution under 43 C.F.R. 2808.10, fined $330, and summoned to this Court. Likewise, Josephine County does not welcome non-recreational camping in its parks. The County issued a letter from its Parks Director on November 12, 2019, stating that "County Parks are not a good alternative for nonrecreational campers – individuals or families who need a place to sleep, due to not having a permenant [sic] residents [sic]." Wessels Decl., Ex. 1 (Dkt. #89-1). This letter urges homeless services providers not to pay for campsites for homeless individuals in County Parks. Wessels Decl. ¶ 8 (Dkt. #89). Similarly, camping, setting up a tent, or remaining in a rest stop for more than 12 hours in a 24-hour period are explicitly prohibited. OAR 734-030-0010(18).

Finally, the City lists three services offered within Grants Pass that similarly do not change the equation under *Martin*. In February 2020, the Umpqua Community Action Network

(UCAN) opened a warming center that may hold up to 40 individuals on nights when the

temperature is either below 30 degrees or below 32 degrees with snow. Wessels Decl. ¶ 9 (Dkt.

#89). From the record, it appears 131 different people have stayed at the warming center since it

opened. *Id.* ¶¶ 9-11. As of the filing of Plaintiffs' Reply Brief, the center had been open sixteen

nights and reached capacity on every night except the first night it opened, when it had 32

occupants. *Id.* ¶ 11. While the opening of a warming shelter is positive for the City, this

emergency warming facility is not a shelter for the purposes of the *Martin* analysis because the

facility does not have beds and is not available consistently throughout the year. *Id.* ¶ 9. Even if

the warming center did count as a shelter under HUD, the capacity of the warming center is not

large enough to accommodate the amount of homeless people in Grants Pass.

The City also referenced a "sobering center" where intoxicated individuals may be

temporarily held and a youth shelter. Response Br. at 13 (Dkt. #80). The sobering center is not a

shelter. It allows for temporary placement for "highly intoxicated" individuals while they sober

up, and for individuals who are creating a nuisance but "do not warrant a trip to jail." Aaron

Hisel Decl., Ex. 1 at 33 (Dkt #81-1). Plaintiffs claim that the sobering center has no beds and

consists of a chair with restraints and 12 locked rooms with toilets where people can sober up for

several hours. Edward Johnson Decl., Ex. 2 (Dkt. #92-2). Hearts with a Mission Youth Shelter

runs an 18-bed facility where minors aged 10-17 may stay for 72 hours, unless they have

parental consent to stay longer. Edward Johnson Decl. ¶ 4 (Dkt. #92). This shelter does not

have enough beds to serve the number of homeless individuals in Grants Pass and is not

"practically available" to class members in this case because it is reserved for minors. The

record is undisputed that Grants Pass has far more homeless individuals than it has practically

available shelter beds.

This case cannot be distinguished from the holding in *Martin*. The alternative shelters suggested by the City do not change the equation set out in *Martin*. Because Grants Pass lacks adequate shelter for its homeless population, its practice of punishing people who have no access to shelter for the act of sleeping or resting outside while having a blanket or other bedding to stay warm and dry constitutes cruel and unusual punishment in violation of the Eighth Amendment.

### b. The Eighth Amendment prohibits cruel and unusual punishment whether the punishment is designated as civil or criminal.

Grants Pass argues that the Eighth Amendment analysis does not apply to the ordinances at issue in this case because they are designated as violations and, therefore, not criminal matters. To support this assertion, Grants Pass quotes the Oregon Court of Appeals, which found "[a] violation is not a crime." *State v. Dahl*, 185 Or App 149, 152-56 (2002) (analyzing Oregon's statutory distinctions between crimes and civil offenses and holding, among other things, that the Fifth Amendment does not apply to violations precisely because they are not crimes). However, the label of crime or violation is not dispositive where the Eighth Amendment is concerned. The focus, for Eighth Amendment purposes, is the punishment associated with the crime, violation, or civil penalty. Even though Grants Pass labels the ordinances as violations, offenders of these violations are still subject to punishment. As the United States Supreme Court has held,

> The purpose of the Eighth Amendment . . . was to limit the government's power to punish. *See Browning-Ferris*, 492 U.S. at 266-267, 275. The Cruel and Unusual Punishments Clause is self-evidently concerned with punishment. 'The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law.' *United States v. Halper*, 490 U.S. 435, 447-448, (1989).

*Austin v. United States,* 509 U.S. 602, 609-610 (1993).

Unlike the Fifth Amendment's Self-Incrimination Clause, the Eighth Amendment's prohibition on punishing an involuntary act or condition applies to punishment beyond "criminal" cases. Again, the Supreme Court made clear,

[The United States] further suggests that the Eighth Amendment cannot apply to a civil proceeding unless that proceeding is so punitive that it must be considered criminal [citations omitted]. We disagree. Some provisions of the Bill of Rights are expressly limited to criminal cases. The Fifth Amendment's Self-Incrimination Clause, for example, provides: "No person...shall be compelled in any criminal case to be a witness against himself." The protections provided by the Sixth Amendment are explicitly confined to "criminal prosecutions." [Citation omitted]. The text of the Eighth Amendment includes no similar limitation. Nor does the history of the Eighth Amendment require such a limitation...

*Austin,* 509 U.S. at 608.

The Supreme Court further opined that provisions of civil forfeiture were punitive because "a civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Id.* at 610 (emphasis in original). Ultimately, the Supreme Court held that civil forfeiture constitutes "payments to a sovereign as punishment for some offense, and, as such, is subject to the limitations of the Eighth Amendment excessive fines clause." *Id.* at 622.

The Court's reasoning and holding in *Austin* has been affirmed by subsequent decisions. Most recently, in *Timbs v. Indiana,* the Supreme Court declined to overrule *Austin:* "We thus decline the State's invitation to reconsider our unanimous judgment in *Austin* that civil *in rem* forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive." *Timbs v. Indiana,* 139 S. Ct. 682, 690 (2019).

Violations of the Boise ordinances analyzed in *Martin* were misdemeanors, 920 F.3d at 603, so the Ninth Circuit at times used the word "criminal" in its analysis. However, a careful reading of *Martin* shows that this language was not a limitation on when the Eighth Amendment's prohibition on cruel and unusual punishment applies. The Ninth Circuit stated the broad question that it was addressing was "[D]oes the Cruel and Unusual Punishments Clause of

the Eighth Amendment preclude the enforcement of a statute prohibiting sleeping outside against

homeless individuals with no access to alternative shelter?" *Id.* at 615. The Ninth Circuit held

that it does, quoting *Jones*, "the Eighth Amendment prohibits the state from punishing an

involuntary act or condition if it is the unavoidable consequence of one's status or being." *Id.* at

616. It is the punishment of a person's unavoidable status that violates the constitution, not

whether that punishment is designated civil or criminal. *See id.* The main difference between

Grants Pass' punishment scheme and that of Boise's in *Martin* is that Grants Pass first issues

fines for violations and then either issues a trespass order or excludes persons from all parks

before a person is charged with misdemeanor criminal trespass. This makes no difference for

Eight Amendment purposes because the result, in Boise and Grants Pass, is identical:

involuntarily homeless people are punished for engaging in the unavoidable acts of sleeping or

resting in a public place when they have nowhere else to go.

Additionally, as the Supreme Court noted, "whether a particular statutorily defined

penalty is civil or criminal is a matter of statutory construction." *United States v. Ward*, 448 U.S.

242, 248 (1980). In Oregon, violations are defined as criminal actions and are prosecuted in

criminal proceedings. ORS 131.005(6)-(7). The Grants Pass Municipal Code uses the language

and procedures of criminal law, discussing those "guilty" of code violations. GPMC

1.36.010(A). The violations are prosecuted in the Josephine County Circuit Court by the

Josephine County District Attorney's office. ORS 153.076(6). As in a criminal trial, a

defendant may not be compelled to testify and the same pretrial discovery that applies in

misdemeanor and felony cases applies. ORS 153.076(3)-(4). The judgment from a camping

violation in Grants Pass reads, "[t]he court finds the defendant GUILTY of the charges

designated CONVICTED in the section below." Edward Johnson Decl., Ex. 9 at 3-4 (Dkt. #63-9).

Moreover, even if *Martin* and the Eighth Amendment were limited to "criminal" punishments, which they are not, Grants Pass' enforcement scheme involves criminal punishment. Violations for sleeping and "camping" are an element of future Criminal Trespass II arrests and initiate the criminal process in two common circumstances: (1) after a person is "trespassed" from an area for "camping" and either does not leave or returns, or (2) after an officer excludes a person from a park for prohibited camping. In either situation, if that person does not move along or returns to the location, they are subject to arrest and prosecution for Criminal Trespass II. The criminal process is initiated with the original citation and that citation is an element of the subsequent criminal trespass charge once the person is trespassed or excluded under threat of arrest for criminal trespassing.

Therefore, Grants Pass' enforcement scheme is subject to Eighth Amendment analysis. Under such analysis, the ordinances at issue and their enforcement, as applied to plaintiff class members, violate the Cruel and Unusual Punishment Clause of the Eighth Amendment.

**II.     Grants Pass' policy and practice of enforcing the ordinances at issue violates the Excessive Fines Clause of the Eight Amendment.**

Grants Pass' enforcement of the ordinances at issue also violates the Excessive Fines Clause of the Eighth Amendment. The Supreme Court has found that the phrase "nor excessive fines imposed," in the Eighth Amendment "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Timbs v. Indiana,* 139 S.Ct. 682, 687 (2019) *citing United States v. Bajakajian,* 524 U.S. 321, 327-328, (1998). There is a two-step inquiry in analyzing an excessive fines claim: (1) is the fine punitive, and if so, (2) is it excessive? *Bajakajian*, 524 U.S. at 334.

To determine when a fine is punitive, courts look to whether the fine is tied to

punishment and prohibited conduct. *Bajakajian*, 524 U.S. at 328; *Austin*, 509 U.S. at 619-22;

*See also U.S. v. Mackby*, 339 F.3d 1013 (9th Cir. 2003) (assuming a statutory fine under the False

Claims Act imposed after a finding of liability in a civil trial was punitive). It does not matter if

the fine imposed is characterized as criminal or civil, the salient inquiry is whether the fine at

least partially serves the traditional punitive functions of retribution and deterrence. *Austin*, 509

U.S. at 610. For example, in *Wright v. Riveland*, the Ninth Circuit held that a 5% deduction for

the Crime Victim's Compensation Fund was punitive because there was no relationship between

the deduction and the harm the defendant caused. *Wright v. Riveland*, 219 F.3d 905, 915 (9th Cir.

2000); *see also Dept. of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 778 (1994)

(observing the similarities between civil and criminal punishment, the court held "Criminal fines,

civil penalties, civil forfeitures, and taxes all share certain features: They generate government

revenues, impose fiscal burdens on individuals, and deter certain behavior."). The Supreme

Court has held that all civil penalties have some deterrent effect. *U.S. v Hudson*, 522 U.S. 93,

102 (1997).

In this case, the Court finds that the fines imposed for violating the ordinances at issue

are punitive. According to the record, the two camping ordinances carry a mandatory fine of

$295. The fine for illegal sleeping is $75. When unpaid, the fines increase to $537.60 and $160

respectively because of additional "collection fees." Johnson Decl., Ex. 9 at 5-6 (Dkt. #63-9).

Officers have the discretion to issue warnings prior to issuing a citation, but once a citation is

issued, officers have no discretion over the amount of the fine, which is "autofilled" into all

camping citations. Johnson Decl., Ex. 6, Burge Depo. at 20, lines 15-21 (Dkt. #63-6); Ex. 4,

Hamilton Depo at p. 84 line 23 to p. 85 line 5 (Dkt. #63-4). Based on the record and minutes

from the 2013 Roundtable Meeting, these statutory fines serve no remedial purpose and were intended to deter homeless individuals from residing in Grants Pass. Moreover, the ordinances themselves describe these fines as punishment. Compare GPMC 1.36.010(c) ("MAXIMUM FINE: except in cases where a different punishment is prescribed by any provision of this Code...") with GPMC 1.36.010(e) (allowing for restitution to any person, or business, including the city, who has been damaged by the defendant's conduct).

Because the fines are punitive, the inquiry turns to whether the fines are excessive. The Supreme Court held that a fine violates the excessiveness standard of the Eighth Amendment if the amount of the fine is "grossly disproportionate to the gravity of the offense." *Bajakajian,* 524 U.S. at 324, 334 ("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."); *see also Wright v. Riveland,* 219 F.3d 905, 916 (9th Cir. 2000) (following *Bajakajian*). In applying this standard, courts have looked to a non-exhaustive list of several factors, including the nature of the offense, whether the violation was related to other illegal activity, and other penalties that may be imposed.[11] *See generally U.S. v. Mackby,* 339 F.3d 1013 (9th Cir. 2003).

Here, the decisive consideration is that Plaintiffs are being punished for engaging in the unavoidable, biological, life-sustaining acts of sleeping and resting while also trying to stay warm and dry. Plaintiffs do not have enough money to obtain shelter, so they likely cannot pay these fines. When the fines remain unpaid, the additional collection fees are applied and the fines still remain unpaid, subjecting plaintiffs to collection efforts, the threat of driver license

---

[11] The Supreme Court has left open the question of whether the ability to pay the fine would be relevant to the excessiveness inquiry. *Bajakajian* at 340, n.15; see also *Timbs* at 688 *quoting* 4 W. Blackstone, Commentaries on the Laws of England 372 (1769) "[N]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear . . . ."

suspensions (Johnson Decl., Ex. 9 at 3-4 (Dkt. #63-9)), and damaged credit that makes it even

more difficult for them to find housing, exacerbating the homeless problem in Grants Pass

(Wessels Dec. ¶11 (Dkt #65)).  As the Supreme Court recognized in the cruel and unusual

punishment context, "even one day in prison would be cruel and unusual punishment for the

'crime' of having a common cold."  *Robinson v. California*, 370 U.S. 660, 667 (1962).  So too

here.  Fining a homeless person in Grants Pass who must sleep outside beneath a blanket because

they cannot find shelter $295 ($537.60 after collection fees are inevitably assessed) is grossly

disproportionate to the "gravity of the offense."  Any fine is excessive if it is imposed on the

basis of status and not conduct.  For Plaintiffs, the conduct for which they face punishment is

inseparable from their status as homeless individuals, and therefore, beyond what the City may

constitutionally punish.  The fines associated with violating the ordinances at issue, as applied to

Plaintiffs, are unconstitutionally excessive.

Having found that the ordinances violate the Cruel and Unusual Punishment Clause as

well as the Excessive Fines Clause of the Eight Amendment, the Court declines to decide

whether the ordinances are also unconstitutionally vague.

III.    **The appeal process for park exclusions in Grants Pass violates procedural due
        process rights.**

   a.  **Plaintiffs' claim that park exclusions violate procedural due process was
       adequately pled and standing has been established.**

Grants Pass does not challenge the merits of plaintiffs' procedural due process claim

regarding the City's park exclusion ordinance in its response to Plaintiffs' motion for summary

judgment.  Instead, Grants Pass argues that this claim was not properly pled in the operative

complaint.  The Court disagrees.  This claim seems to be the sole reason for the Third Amended

Complaint filed on November 13, 2019.  (Dkt. #50).  The only changes from the Second

Amended Complaint were to add the allegation at paragraph 87 that, "Plaintiffs have been

excluded from Grants Pass parks without due process of law" and to specifically add "GPMC 6.46.350 (the park exclusion ordinance)" to the injunctive and declaratory relief sought in this case. Third Amended Complaint ¶ 87, Prayer ¶¶ 3-4 (Dkt. #50). Although the City correctly points out that GPMC 6.46.355 (the ordinance that explains the appeal procedure) is missing from the operative complaint, Plaintiffs made clear that they were challenging park exclusions under the Procedural Due Process Clause. The City did not object to the amendment or ask that it be clarified or made more specific. Therefore, the claim was pled, and the City was on notice.

Second, Grants Pass argues that if the claim was pled, it should be dismissed because Plaintiffs have not alleged or sufficiently established standing. The City argues, "plaintiffs do not even attempt to produce a plaintiff or rely upon any individual's standing." Response at 51 (Dkt. #80). The Court disagrees. The record shows that of the 59 park exclusions produced to Plaintiffs by the City, all were issued to homeless individuals and 42 were issued for illegal camping. Pltf.s' Motion at 22 (Dkt. #62); Inessa Wurscher Decl. ¶ 7 (Dkt. #64). Class representative Debra Blake was issued an exclusion on September 11, 2019, after she was found sleeping in a City Park, and a copy of that exclusion order has been provided in the record. Johnson Decl., Ex. 9 at 7 (Dkt. #63-9). Debra Blake filed a written objection to her September 11, 2019 banishment from all parks. The ban was "lifted" without explanation on September 25, 2019, after half of the exclusion period had expired. Blake Decl. ¶ 8 (Dkt. #90). Additionally, class member Dolores Nevin was excluded from all parks after being found sleeping in Riverside Park on December 31, 2019. Wurscher Decl., Ex. 1 at 33-35 (Dkt. #64-1). Moreover, Plaintiffs provided evidence that a park exclusion goes into effect immediately and is not stayed when appealed. Johnson Decl., Ex. 5, McGinnis Depo p. 28 line 23 to p. 29 line 5 (Dkt. #63-5); Ex. 4,

Hamilton Depo. at p.117 lines 11-14 (Dkt. #63-4). Therefore, Plaintiffs have standing to seek prospective declaratory and injunctive relief regarding the park exclusion appeal process.

Finally, Grants Pass argues in a footnote that if the claim was pled and plaintiffs do have standing, the claim is "moot" because the current practice of the Grants Pass Department of Public Safety is to not issue park exclusions until City Council "has made appropriate revisions." Response at 51, n.8 (Dkt. #80). Evidence presented by Grants Pass to show this policy change consists of a sworn declaration from Jim Hamilton, the Deputy Chief for the City of Grants Pass Department of Public Safety, in which he declares, "The current practice is that there are no park exclusions being issued by anyone in the Grants Pass Department of Public Safety by way of written Order from me. Unless and until a revised version of the park exclusion ordinance is adopted by the City council and the related forms revised, they will not be issued." Hamilton Decl. ¶ 3 (Dkt. #83). The written order issued to the department was not attached as an exhibit. However, even if it was, policy changes not reflected in a change to statutes or ordinances does not render a claim moot. *Rosebrock,* 745 F.3d at 971-72. The doctrine of voluntary cessation has been interpreted to apply generally in cases in which an injunction is sought. "Such cases do not become moot 'merely because the [defendant's] conduct immediately complained of has terminated, if there is a possibility of a recurrence which would be within the terms of a proper decree.'" *Armster v. U.S. District Court for the Central District of California,* 806 F.2d 1347, 1357 (9th Cir. 1986) (quoting P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 110 (2d ed. 1973)). This is particularly true, whereas here, the "new policy. . . could be easily abandoned or altered in the future." *Bell,* 709 F.3d at 901. If a municipal defendant could moot out claims simply by announcing in its cross-motion for summary judgment that it has decided not to enforce the offending ordinance,

the doctrine of voluntary cessation would be rendered meaningless. Plaintiffs pled this claim, have standing to assert it, and Grants Pass cannot moot this claim by asserting that it has temporarily stopped issuing park exclusions.

### b. Plaintiffs are entitled to summary judgment on this claim.

Under Grants Pass' enforcement scheme, police officers may issue a written exclusion order barring an individual "from all city park properties for a period of 30 days, if within a one-year period the individual is issued two or more citations for violating regulations related to city park properties, or is issued one or more citations for violating any state law(s) while on city park property." GPMC 6.46.350. A park exclusion goes into effect immediately upon being issued and is not stayed while a person appeals. Johnson Decl., Ex. 5, McGinnis Depo p. 28 line 23 to p. 29 line 5 (Dkt. #63-5); Ex. 4, Hamilton Depo. at p.117 lines 11-14 (Dkt. #63-4); GPMC 6.46.355. The appeal period is "within two business days" and the method of appeal is by "written objection" to the City Manager, at which point the objection will be placed on the City Council's agenda. GPMC 6.46.355.

Sixteen years ago, this Court found a substantially identical appeal process in Portland's park exclusion ordinance to violate procedural due process rights.

> The risk of erroneous deprivation is compounded by PCC 20.12.265's deficient appeal procedures and lack of a pre-deprivation hearing. An exclusion takes effect immediately upon issuance and is not stayed pending appeal. Thus, a person excluded from a park is subject to arrest for reentry as soon as she receives the exclusion notice. An appeal may be filed within five days, but the individual continues to be excluded from the parks. Thus, even if the exclusion is ultimately found to be invalid, the individual has been kept from the public park(s) for at least a significant portion of the thirty days.

*Yeakle v. City of Portland,* 322 F. Supp. 2d 1119, 1130 (D. Or. 2004). For the same reasons, Grants Pass' park exclusion ordinance is also unconstitutional and violates the procedural protections of the due process clause.

The *Yeakle* court applied the three-part balancing test from *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976) to Portland's functionally identical park exclusion appeal process. The court found that excluded individuals have a strong liberty interest in avoiding unjust exclusion because of the importance of public parks as a "treasured and unmatched resource" for members of the public. 322 F. Supp 2d at 1129. In this case, that interest is even greater for Plaintiffs because several parks in Grants Pass contain benches, tables and restrooms that homeless individuals may use for basic activities of daily life when they have no alternative place to dwell. The court also found that "the risk of erroneous deprivation under the present procedure is considerable" given the lack of pre-deprivation process and the lack of "any evidentiary standard." *Id.* at 1130. The same is true here. There is no requirement in the ordinance that the Grants Pass police officer have enough evidence or reasonable suspicion of the excludable conduct to issue an exclusion or make an arrest. The officer need not witness the violation or have any other reliable information that a violation occurred under the language of the ordinance. Further, just like in *Yeakle*, "a person is subject to arrest for reentry as soon as she receives the exclusion notice" and "even if the exclusion is ultimately found to be invalid, the individual has been kept from the public parks for at least a significant portion of the thirty days." *Id.* The *Yeakle* Court concluded that "a pre-deprivation hearing or other procedural safeguard would not unduly burden the government" and "there would be no additional burden on the City if the park exclusions were simply stayed in the event that an individual filed an appeal." *Id.* at 1131. For the same reasons, the procedures for appealing park exclusions in Grants Pass violate Plaintiffs' procedural due process rights.

IV.    **Plaintiffs are denied summary judgment on their Equal Protection Claim.**

The Equal Protection Clause guarantees that "all persons similarly circumstanced shall be

treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  Plaintiffs allege selective enforcement

of the ordinances at issue.  As such, they "must demonstrate that enforcement had a

discriminatory effect and the police were motivated by a discriminatory purpose." *Rosenbaum v.*

*City and County of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007).  Further, because the

class seeks to enjoin enforcement, they must demonstrate that the selective enforcement "is part

of a 'policy, plan, or a pervasive pattern.'" *Id.* at 1153 (quoting *Thomas v. County of Los*

*Angeles*, 978 F.2d 504, 509 (9th Cir. 1993)).

Plaintiffs did not carry their burden of demonstrating that the City's ordinances were

selectively enforced and that enforcement was motivated by a discriminatory purpose under the

summary judgment standard.  The evidence relied on by Plaintiffs to prove this claim are the

minutes from the 2013 Roundtable Meeting and deposition testimony from two Grants Pass

police officers.  The City disputes this evidence as proof of selective enforcement.  The City

argues that deposition testimony from two knowledgeable police officers that they "could not

remember" enforcing these ordinances against a non-homeless individual is not enough for the

Court to conclude that these ordinances were selectively enforced as a matter of law.  The Court

agrees.  Moreover, the City provided its Department of Public Safety Policy Manual, which

specifically includes instructions to officers to not discriminate against homeless individuals.

*See* Hamilton Decl., Ex. 1 (Dkt. #83-1).  Therefore, facts surrounding the issues of whether the

City's enforcement scheme had a discriminatory effect and whether the police were motivated by

a discriminatory purpose are in dispute.  As a result, Plaintiff's are denied summary judgment on

their equal protection claim.

**V.    Plaintiff's are denied summary judgment on their Substantive Due Process Claim.**

The substantive due process clause of the Fourteenth Amendment forbids the government from depriving a person of life, liberty, or property when the government acts with deliberate indifference or reckless disregard for that person's fundamental rights. *Tennison v. City & County of S.F.*, 570 F.3d 1078, 1089 (9th Cir. 2009); *Porter v. Osborn*, 546 F.3d 1131, 1137-39 (9th Cir. 2008). A plaintiff establishes a substantive due process violation by showing the defendant deprived him of his life, liberty, or property and engaged in "conscience shocking behavior." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). An official's conduct may shock the conscience where the official acts with deliberate indifference or reckless disregard for the plaintiff's rights in situations where the official had the opportunity to deliberate. *Tennison*, 570 F.3d at 1089; *Porter*, 546 F.3d at 1137-39.

Plaintiffs argue they have a protected liberty interest in being present in public spaces in Grants Pass. Plaintiffs cite *Morales*, which found "it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage,' or the right to move 'to whatsoever place one's own inclination may direct' identified in Blackstone's Commentaries." 27 U.S. at 53-54 (citing *Williams v. Fears*, 179 U.S. 270, 274 (1900); *Papachristou v. Jacksonville*, 405 U.S. 156, 164 (1972); *Kent v. Dulles*, 357 U.S. 116, 126 (1958); 1 W. Blackstone, Commentaries on the Laws of England 130 (1765)). At least three Courts of Appeals have followed *Morales* and acknowledged a liberty interest to remain in a place open to the public. See *Vincent v. City of Sulphur*, 805 F.3d 543, 548 (5th Cir. 2015) ("Supreme Court decisions amply support the proposition that there is a general right to go to or remain on public property for lawful purposes . . . ."); *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) ("Plaintiffs have a

constitutionally protected liberty interest to be in parks or on other city lands of their choosing

that are open to the public generally."); *Kennedy v. City of Cincinnati*, 595 F.3d 327, 336 (6th

Cir. 2010) ("[I]t is clear that Kennedy had a liberty interest 'to remain in a public place of his

choice' and that defendants interfered with this interest.").

However, even if this Court were to find that Plaintiffs have a liberty interest to remain in

City parks or other City lands that are open to the public generally, Plaintiffs have not provided

this Court with controlling authority to convince the Court that Plaintiffs have a liberty interest to

sleep or camp in a public place. Moreover, Plaintiffs have not carried their burden of showing

that the City engaged in "conscience shocking behavior" under the summary judgment standard.

This Court's holding that the enforcement of Grants Pass' ordinances violate the Eight

Amendment does not automatically translate to a finding that Grants Pass officials acted with

deliberate indifference or reckless disregard for Plaintiffs' fundamental rights. Whether Grants

Pass' conduct shocks the conscience is a question of material fact. Therefore, Plaintiffs are

denied summary judgment on their substantive due process claim.

## VI.    Conclusion

The holding in this case does not say that Grants Pass must allow homeless camps to be

set up at all times in public parks. Just like in *Martin*, this holding in no way dictates to a local

government that it must provide sufficient shelter for the homeless, or allow anyone who wishes

to sit, lie, or sleep on the street at any time and at any place. *See Martin*, 920 F.3d 584, 617. Nor

does this holding "cover individuals who do have access to adequate temporary shelter, whether

they have the means to pay for it or because it is realistically available to them for free, but who

choose not to use it." *Id.* at n. 8. The City may implement time and place restrictions for when

homeless individuals may use their belongings to keep warm and dry and when they must have

their belonging packed up. The City may also implement an anti-camping ordinance that is more

specific than the one in place now.  For example, the City may ban the use of tents in public parks without going so far as to ban people from using any bedding type materials to keep warm and dry while they sleep.  The City may also consider limiting the amount of bedding type materials allowed per individual in public places.  Moreover, this holding does not limit Grants Pass' ability to enforce laws that actually further public health and safety, such as laws restricting littering, public urination or defecation, obstruction of roadways, possession or distribution of illicit substances, harassment, or violence.  Grants Pass would retain a large toolbox for regulating public space without violating the Eight Amendment.

There is no doubt that homelessness is a serious public health concern.  Homeless individuals have higher rates of chronic physical and mental health conditions, increased rates of mortality, and related diseases and co-occurring disorders.[12]  With the lack of access to the most basic of human needs, including running water, toilets, and trash disposal, infectious diseases— like COVID-19—can spread quickly.  Uprooting homeless individuals, without providing them with basic sanitation and waste disposal needs, does nothing more than shift a public health crisis from one location to another, potentially endangering the health of the public in both locations. This concern is particularly acute during the current COVID-19 pandemic.  As the U.S. Centers for Disease Control and Prevention (the "CDC") explained in its *Interim Guidance for Responding to Coronavirus Disease 2019 (COVID-19) among People Experiencing Unsheltered Homelessness*: Unless individual housing units are available, do not clear encampments during community spread of COVID-19.

The Court encourages Grants Pass to work with local homeless services experts and mental health professionals to develop training programs that cover techniques and tools for

---

[12] *Housing Not Handcuffs, supra* note 2 at 68.

interacting with homeless individuals and for deescalating mental health crises. For example, the City of Eugene, Oregon has used the services from an organization called CAHOOTS ("Crisis Assistance Helping Out on the Streets") to provide free "immediate stabilization in cases of urgent medical need or psychological crisis, assessment, information referral, advocacy [and] (in some cases) transportation to the next step in treatment" to the people of Eugene, Oregon.[13]  As *The Wall Street Journal* noted, Gary Marshall, a 64-year-old who previously lived on the streets of Eugene, said the police approach was "name, serial number and up against the van." In contrast, when he was having one of his frequent panic attacks, CAHOOTS counselors would bring the him inside and talk him down, he said.[14]

Such trainings have also been proven to be effective in Miami-Dade County, Florida. Specifically, "providing mental health de-escalation training to [its] police officers and 911 dispatchers enabled [the county] to divert more than 10,000 people to services or safely stabilizing situations without arrest."[15]  The number of people in jail, in turn, fell by nearly 49%, which allowed the county to close an entire jail facility, thereby saving nearly $12 million a year.[16]

The City of Medford, Oregon, has also developed new strategies for addressing the homeless crisis in its community. The City of Medford worked with Rogue Retreat, a nonprofit group, to open Hope Village in November 2017.[17]  Hope Village is the first tiny homes

---

[13] CAHOOTS, https://whitebirdclinic.org/cahoots/ (last visited Mar. 26, 2020); Mobile Crisis Services in Eugene and Springfield, *White Bird Clinic CAHOOTS*, https://whitebirdclinic.org/wp-content/uploads/2019/04/11x8.5_trifold_brochure_cahoots.pdf.

[14] Zusha Elinson, *When Mental-Health Experts, Not Police, Are the First Responders,* THE WALL STREET JOURNAL (Nov. 24, 2018), https://www.wsj.com/articles/when-mental-healthexperts-not-police-are-the-first-responders-1543071600.

[15] *Housing Not Handcuffs, supra* note 2 at 98.

[16] *Id.*

[17] Rogue Retreat, *Hope Village*, https://www.rogueretreat.com/housing-programs/hope-village/ (last visited Jul. 17, 2020).

community in Southern Oregon that provides short term transitional shelter and case management for individuals and families to help move from homelessness into long term housing.[18]  The idea of Hope Village was created in 2013, when Rogue Retreat, St. Vincent DePaul, and the Jackson County Homeless Taskforce began researching and visiting other villages in Oregon to find creative ways to serve the homeless in Jackson County.[19]  Hope Village started with 14 units, each 8 feet by 10 feet, plus a communal kitchen, laundry and shower facilities.  Hope Village began operating under a one-year agreement with the city, and in less than a year, the Medford City Council approved doubling the size of the village and signed a new, two-year agreement with Rogue Retreat.[20]  Medford city officials didn't create the project, didn't build the units, and doesn't operate the village.  However, city leaders supported the concept from the beginning, offering a city-owned property for the village.[21]  When neighboring businesses and other property owners objected to that location, the City of Medford continued to offer support and encouragement, culminating in a new location.[22]  Hope Village now sits on property owned by the City of Medford and another property leased by Rogue Retreat.[23]  Residents of Hope Village are required to attend case management meetings, counseling sessions, and work on permanent ways to stay off of the streets.  Rogue Retreat says the average

---

[18] *Id.*

[19] *Id.*

[20] Mail Tribune Editorial Board, *Medford can be proud of Hope Village*, THE MAIL TRIBUNE (Aug. 4, 2019), https://mailtribune.com/opinion/editorials/medford-can-be-proud-of-hope-village.

[21] *Id.*

[22] *Id.; see also* April Ehrlich, *Law Enforcement Officials Argue Rural Homeless Services Worsen Problem*, NPR (Jan. 21, 2020), https://www.npr.org/2020/01/21/797497926/law-enforcement-officials-argue-rural-homeless-services-worsen-problem ("Hope Village in Oregon faced some pushback in its early stages a few years ago. Some people feared that it would increase crime and generate litter. But resident Buckshot Cunningham says those fears proved to be wrong. 'Look at this place,' he says, motioning to the neat row of cottages. 'It's clean; it's beautiful. And it stays that way seven days a week, all year round. It's pretty simple.'").

[23] Mail Tribune Editorial Board, *Medford can be proud of Hope Village*, THE MAIL TRIBUNE (Aug. 4, 2019), https://mailtribune.com/opinion/editorials/medford-can-be-proud-of-hope-village.

stay at Hope Village is around four months, and the program has a 62 percent success rate. According to Rogue Retreat, this means 6 out of 10 people in the program successfully move away from homelessness.[24]

As the League of Oregon Cities noted in its amicus brief, "Oregon's cities are obligated to provide safe and livable communities for all residents." Cities Br. at 2 (Dkt. #87). Laws that punish people because they are unhoused and have no other place to go undermine cities' ability to fulfill this obligation. Indeed, enforcement of such "quality of life laws" do nothing to cure the homeless crisis in this country. Arresting the homeless is almost never an adequate solution because, apart from the constitutional impediments, it is expensive, not rehabilitating, often a waste of limited public resources, and does nothing to serve those homeless individuals who suffer from mental illness and substance abuse addiction.

Quality of life laws erode the little trust that remains between homeless individuals and law enforcement officials. This erosion of trust not only increases the risk of confrontations between law enforcement and homeless individuals, but it also makes it less likely that homeless individuals will cooperate with law enforcement.[25] Moreover, quality of life laws, even civil citations, contribute to a cycle of incarceration and recidivism. Indeed, civil citations requiring appearance in court can lead to warrants for failure to appear when homeless people, who lack a physical address or phone number, do not receive notice of relevant hearings and wind up incarcerated as a result.[26] Moreover, unpaid civil citations can impact a person's credit history and be a direct bar to housing access in competitive rental markets where credit history is a factor

---

[24] Madison LaBerge, *New tiny home village in Grants Pass for homeless population*, FOX 26 (June 10, 2020), https://fox26medford.com/new-tiny-home-village-in-grants-pass-for-homeless-population/
[25] *Housing Not Handcuffs*, *supra* note 2 at 65.
[26] *Id.* at 52.

in tenant selection. In this way, civil penalties can prevent homeless people from accessing the very housing that they need to move from outdoor public spaces to indoor private ones.

There are many options available to Grants Pass to prevent the erection of encampments that cause public health and safety concerns without violating the Eight Amendment. The Court reminds governing bodies of the importance of empathy and thinking outside the box. We must try harder to protect our most vulnerable citizens. Let us not forget that homeless individuals are citizens just as much as those fortunate enough to have a secure living space.

## ORDER

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Dkt. No. 62) is GRANTED in part and DENIED in part, and Defendant's Motion for Summary Judgment (Dkt. No. 80) is DENIED.

IT IS SO ORDERED and DATED this 22nd day of July, 2020.


/s/ Mark D. Clarke
MARK D. CLARKE
United States Magistrate Judge

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on May 5, 2021, I electronically filed the foregoing

Petition for Hearing *En Banc* with the Clerk of the Court for the United States

Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system,

and that all participants in this case are registered CM/ECF users.


                s/ Aaron P. Hisel
Aaron P. Hisel, OSB #161265
Of Attorneys for Defendant-Appellant