**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GLORIA JOHNSON; JOHN LOGAN, individuals, on behalf of themselves and all others similarly situated, *Plaintiffs-Appellees*, <br><br> v. <br><br> CITY OF GRANTS PASS, *Defendant-Appellant.* | Nos. 20-35752 20-35881 <br><br> D.C. No. 1:18-cv-01823-CL <br><br> OPINION |

Appeal from the United States District Court
for the District of Oregon
Mark D. Clarke, Magistrate Judge, Presiding

Argued and Submitted December 6, 2021
San Francisco, California

Filed September 28, 2022

Before: Ronald M. Gould and Daniel P. Collins, Circuit
Judges, and Roslyn O. Silver,[*] District Judge.

Opinion by Judge Silver;
Dissent by Judge Collins

---

[*] The Honorable Roslyn O. Silver, United States District Judge for
the District of Arizona, sitting by designation.

## SUMMARY[**]

---

### Civil Rights

The panel affirmed in part and vacated in part the district court's summary judgment and its permanent injunction in favor of plaintiffs; affirmed certification pursuant to Fed. R. Civ. P. 23(b)(2), of a class of "involuntary homeless" persons; and remanded in an action challenging municipal ordinances which, among other things, preclude homeless persons from using a blanket, a pillow, or cardboard box for protection from the elements while sleeping within the City's limits.

The five ordinances, described as an "anti-sleeping" ordinance, two "anti-camping" ordinances, a "park exclusion" ordinance, and a "park exclusion appeals" ordinance, result in civil fines up to several hundred dollars per violation. Persons found to violate ordinances multiple times could be barred from all City property. If a homeless person is found on City property after receiving an exclusion order, they are subject to criminal prosecution for trespass.

The panel stated that this court's decision in *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), which held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter" served as the backdrop for this entire litigation.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel first rejected the City's argument that the district court lacked jurisdiction because plaintiffs' claims were moot or because plaintiffs failed to identify any relief that was within a federal court's power to redress. The panel held that there was abundant evidence in the record establishing that homeless persons were injured by the City's enforcement actions in the past and it was undisputed that enforcements have continued. The panel further held that the relief sought by plaintiffs, enjoining enforcement of a few municipal ordinances aimed at involuntary homeless persons, was redressable within the limits of Article III. The death of class representative Debra Blake while the matter was on appeal did not moot the class's claims as to all challenged ordinances except possibly the anti-sleeping ordinance. The panel vacated the summary judgment as to that ordinance and remanded to allow the district court the opportunity to substitute a class representative in Blake's stead. The remaining class representatives had standing to challenge the park exclusion, criminal trespass and anti-camping ordinances.

The panel held that based on the record in this case, the district court did not err by finding plaintiffs satisfied the requirements of Fed. R. Civ. P. 23(a) such that a class could be certified under Rule 23(b)(2). Although the City appeared to suggest that *Martin's* need for an individualized inquiry of each alleged involuntary homeless person's access to shelter defeated numerosity, commonality and typicality, the panel held that nothing in *Martin* precluded class actions. The panel held that the district court did not abuse its discretion in concluding the numerosity requirement was met; that plaintiffs' claims presented at least one question and answer common to the class; and the class representatives' claims and defenses were typical of the class in that they were homeless persons who claimed that

the City could not enforce the challenged ordinances against them when they have no shelter.

Addressing the merits, the panel affirmed the district court's ruling that the City of Grants Pass could not, consistent with the Eighth Amendment, enforce its anti-camping ordinances against homeless persons for the mere act of sleeping outside with rudimentary protection from the elements, or for sleeping in their car at night, when there was no other place in the City for them to go. The panel held that *Martin* applied to civil citations where, as here, the civil and criminal punishments were closely intertwined.

There was no need to resolve whether the fines imposed under the anti-sleeping anti-camping ordinances violated the Eighth Amendment's prohibition on excessive fines because the permanent injunction would result in no class member being fined for engaging in such protected activity. Finally, the panel held that it was unnecessary to decide whether plaintiffs properly pled their procedural due process challenge to the park exclusion appeals ordinance because subsequent to the district court's order, the City amended the ordinance.

The panel directed the district court on remand to narrow its injunction to enjoin only those portions of the anti-camping ordinances that prohibited conduct protected by *Martin* and this opinion. In particular, the district court should narrow its injunction to the anti-camping ordinances and enjoin enforcement of those ordinances only against involuntarily homeless person for engaging in conduct necessary to protect themselves from the elements when there was no shelter space available.

Dissenting, Judge Collins stated that *Martin* seriously misconstrued the Eighth Amendment and the Supreme Court's caselaw construing it, but even assuming that *Martin* remained good law, today's decision—which both misread and greatly expanded *Martin*'s holding—was egregiously wrong. To make things worse, the majority opinion combined its gross misreading of *Martin,* which requires an individualized inquiry*,* with a flagrant disregard of settled class-certification principles pertaining to commonality under Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b). The end result of this amalgamation of error was that the majority validated the core aspects of the district court's extraordinary injunction in this case, which effectively requires the City of Grants Pass to allow all but one of its public parks to be used as homeless encampments.

## COUNSEL

Aaron P. Hisel (argued), Law Offices of Montoya Hisel and Associates, Salem, Oregon; Gerald L. Warren, Law Office of Gerald L. Warren, Salem, Oregon, for Defendant-Appellant.

Edward Johnson (argued) and Walter Fonseca, Oregon Law Center, Portland, Oregon, for Plaintiffs-Appellees.

Eric S. Tars, National Homelessness Law Center, Washington, D.C.; Tamar Ezer, Acting Director; David Berris, Joe Candelaria, and Lily Fontenot, Legal Interns; David Stuzin, Student Fellow; University of Miami School of Law, Human Rights Clinic, Coral Gables, Florida; Leilani Farha, Former United Nations Special Rapporteur on the Right to Adequate Housing and Global Director, The Shift #Right2Housing, Ottawa, Ontario, Canada; for Amici

Curiae University of Miami School of Law, Human Rights Clinic and National Homelessness Law Center.

Kelsi B. Corkran and Seth Wayne, Institute for Constitutional Advocacy & Protection, Washington, D.C., for Amicus Curiae Fines and Fees Justice Center.

John He, Leslie Bailey, and Brian Hardingham, Public Justice, Oakland, California; John Thomas H. Do, ACLU Foundation of Northern California, San Francisco, California; for Amici Curiae Public Justice, ACLU of Northern California, ACLU of Southern California, ACLU of Oregon, Institute for Justice, National Center for Law and Economic Justice, and Rutherford Institute.

Nicolle Jacoby, Dechert LLP, New York, New York; Tristia M. Bauman, National Homelessness Law Center, Washington, D.C.; for Amici Curiae National Homelessness Law Center, Homeless Rights Advocacy Project at the Korematsu Center for Law and Equality at Seattle University School of Law, and National Coalition for the Homeless.

# OPINION

SILVER, District Judge:

The City of Grants Pass in southern Oregon has a population of approximately 38,000. At least fifty, and perhaps as many as 600, homeless persons live in the City.[1] And the number of homeless persons outnumber the available shelter beds. In other words, homeless persons have nowhere to shelter and sleep in the City other than on the streets or in parks. Nonetheless, City ordinances preclude homeless persons from using a blanket, a pillow, or a cardboard box for protection from the elements while sleeping within the City's limits. The ordinances result in civil fines up to several hundred dollars per violation and persons found to violate ordinances multiple times can be barred from all City property. And if a homeless person is found on City property after receiving an exclusion order, they are subject to criminal prosecution for trespass.

In September 2018, a three-judge panel issued *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), holding "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Id.* at 1048. Approximately six weeks after the initial *Martin* panel opinion, three homeless individuals filed a putative class action complaint against the City arguing a number of City ordinances were unconstitutional. The district court certified a class of "involuntarily homeless" persons and later granted partial summary judgment in favor

---

[1] During this litigation the parties have used different phrases when referring to this population. For simplicity, we use "homeless persons" throughout this opinion.

of the class.[2] After the plaintiffs voluntarily dismissed some claims not resolved at summary judgment, the district court issued a permanent injunction prohibiting enforcement against the class members of some City ordinances, at certain times, in certain places. The City now appeals, arguing this case is moot, the class should not have been certified, the claims fail on the merits, and Plaintiffs did not adequately plead one of their theories. On the material aspects of this case, the district court was right.[3]

---

[2] Persons are involuntarily homeless if they do not "have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free." *See Martin*, 920 F.3d at 617 n.8. However, someone who has the financial means to obtain shelter, or someone who is staying in an emergency shelter is not involuntarily homeless. *See id.* at 617 n.8. Contrary to the City's argument, this definition of involuntary homelessness is not the same as the definition of "homeless" found in regulations for the Department of Housing and Urban Development, 24 C.F.R. § 582.5, or the McKinney-Vento Act, 42 U.S.C. § 11434a(2), the federal law regarding the right of homeless children to a public education. For example, the McKinney-Vento Act includes as "homeless children and youths" persons who may not qualify as involuntarily homeless under *Martin*, such as children and youths "living in emergency or transitional shelters." 42 U.S.C. § 11434a(2). Though the district court noted in part that Plaintiffs met the definition of homelessness set forth in 24 C.F.R. § 582.5, the district court also relied on the specific definition of unsheltered homeless persons set forth in the Department of Housing and Urban Development's regulations regarding point-in-time counts: "persons who are living in a place not designed or ordinarily used as a regular sleeping accommodation for humans must be counted as unsheltered homeless persons." 24 C.F.R. § 578.7(c)(2)(i).

[3] Our dissenting colleague's strong disagreement with the majority largely arises from his disapproval of *Martin*. *See, e.g.*, Dissent 50 ("Even assuming *Martin* remains good law . . ."); Dissent 83 (". . . and the gravity of *Martin*'s errors."); Dissent 85 (claiming, without evidence, that "it is hard to deny that *Martin* has 'generate[d] dire practical

## I.

This case involves challenges to five provisions of the Grants Pass Municipal Code ("GPMC"). The provisions can be described as an "anti-sleeping" ordinance, two "anti-camping" ordinances, a "park exclusion" ordinance, and a "park exclusion appeals" ordinance. When the district court entered judgment, the various ordinances consisted of the following.

First, the anti-sleeping ordinance stated, in full

> *Sleeping on Sidewalks, Streets, Alleys, or Within Doorways Prohibited*
>
> A. No person may sleep on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety.
>
> B. No person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk.
>
> C. In addition to any other remedy provided by law, any person found in violation of this section may be immediately removed from the premises.

GPMC 5.61.020. A violation of this ordinance resulted in a presumptive $75 fine. If unpaid, that fine escalated to $160. If a violator pled guilty, the fines could be reduced by a state

---

consequences") (modification in original and citation omitted). But *Martin* is controlling law in the Ninth Circuit, to which we are required to adhere.

circuit court judge to $35 for a first offense and $50 for a
second offense.  GPMC 1.36.010(K).

Next, the general anti-camping ordinance prohibited
persons from occupying a "campsite" on all public property,
such as parks, benches, or rights of way.  GPMC 5.61.030.
The term "campsite" was defined as

> any place where bedding, sleeping bag, or
> other material used for bedding purposes, or
> any stove or fire is placed, established, or
> maintained for the purpose of maintaining a
> temporary place to live, whether or not such
> place incorporates the use of any tent, lean-
> to, shack, or any other structure, or any
> vehicle or part thereof.

GPMC 5.61.010.   A second overlapping anti-camping
ordinance prohibited camping in public parks, including
"[o]vernight parking" of any vehicle.  GPMC 6.46.090.  A
homeless individual would violate this parking prohibition if
she parked or left "a vehicle parked for two consecutive
hours [in a City park] . . . between the hours of midnight and
6:00 a.m."  *Id.*  Violations of either anti-camping ordinance
resulted in a fine of $295.  If unpaid, the fine escalated to
$537.60.  However, if a violator pled guilty, the fine could
be reduced to $180 for a first offense and $225 for a second
offense.  GPMC 1.36.010(J).

Finally, the "park exclusion" ordinance allowed a police
officer to bar an individual from all city parks for 30 days if,
within one year, the individual was issued two or more
citations for violating park regulations.  GPMC 6.46.350(A).
Pursuant to the "park exclusion appeals" ordinance,
exclusion orders could be appealed to the City Council.
GPMC 6.46.355.   If an individual received a "park

exclusion" order, but subsequently was found in a city park, that individual would be prosecuted for criminal trespass.

Since at least 2013, City leaders have viewed homeless persons as cause for substantial concern. That year the City Council convened a Community Roundtable ("Roundtable") "to identify solutions to current vagrancy problems." Participants discussed the possibility of "driving repeat offenders out of town and leaving them there." The City's Public Safety Director noted police officers had bought homeless persons bus tickets out of town, only to have the person returned to the City from the location where they were sent. A city councilor made clear the City's goal should be "to make it uncomfortable enough for [homeless persons] in our city so they will want to move on down the road." The planned actions resulting from the Roundtable included increased enforcement of City ordinances, including the anti-camping ordinances.

The year following the Roundtable saw a significant increase in enforcement of the City's anti-sleeping and anti-camping ordinances. From 2013 through 2018, the City issued a steady stream of tickets under the ordinances.[4] On September 4, 2018, a three-judge panel issued its opinion in

---

[4] The City issued the following number of tickets under the anti-sleeping and anti-camping ordinances:

2013: 74 total tickets
2014: 228 total tickets
2015: 80 total tickets
2016: 47 total tickets
2017: 99 total tickets
2018: 46 total tickets

*Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018).[5] That case served as the backdrop for this entire litigation.

In *Martin*, six homeless or recently homeless individuals sued the city of Boise, Idaho, seeking relief from criminal prosecution under two city ordinances related to public camping. *Martin*, 920 F.3d at 603–04. As relevant here, *Martin* held the Cruel and Unusual Punishment Clause of the "Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Id.* at 616. *Martin* made clear, however, that a city is not required to "provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id.* at 617 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007)) (omission in original).

---

[5] Following the opinion, the City of Boise petitioned for rehearing en banc. On April 1, 2019, an amended panel opinion was issued and the petition for rehearing was denied. Judge M. Smith, joined by five other judges, dissented from the denial of rehearing en banc. He argued the three-judge panel had, among other errors, misinterpreted the Supreme Court precedents regarding the criminalization of involuntary conduct. *Martin*, 920 F.3d at 591–92 (M. Smith, J., dissenting from denial of rehearing en banc). Judge Bennett, joined by four judges, also dissented from the denial of rehearing en banc. Judge Bennett argued the three-judge panel's opinion was inconsistent with the original public meaning of the Cruel and Unusual Punishment Clause. *Id.* at 599 (Bennett, J., dissenting from denial of rehearing en banc). The merits of those dissents do not alter the binding nature of the amended *Martin* panel opinion. Unless otherwise indicated, all citations to *Martin* throughout the remainder of this opinion are to the amended panel opinion.

The formula established in *Martin* is that the government cannot prosecute homeless people for sleeping in public if there "is a greater number of homeless individuals in [a jurisdiction] than the number of available" shelter spaces. *Id.* (alteration in original). When assessing the number of shelter spaces, *Martin* held shelters with a "mandatory religious focus" could not be counted as available due to potential violations of the First Amendment's Establishment Clause. *Id.* at 609–10 (citing *Inouye v. Kemna*, 504 F.3d 705, 712–13 (9th Cir. 2007)).

In October 2018, approximately six weeks after the *Martin* opinion, Debra Blake filed her putative class action complaint against the City. The complaint alleged enforcement of the City's anti-sleeping and anti-camping ordinances violated the Cruel and Unusual Punishment Clause of the Eighth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. The complaint was amended to include additional named plaintiffs and to allege a claim that the fines imposed under the ordinances violated the Excessive Fines Clause of the Eighth Amendment. On January 2, 2019, a few months after the initial complaint was filed, and before Plaintiffs filed their class certification motion, the City amended its anti-camping ordinance in an attempt to come into compliance with *Martin*. Prior to this change, the anti-camping ordinance was worded such that "'sleeping' in parks . . . automatically constitut[ed] 'camping.'" According to the City, "in direct response to *Martin v. Boise*, the City amended [the anti-camping ordinance] to make it clear that the act of 'sleeping' was to be distinguished from the prohibited conduct of 'camping.'" The City meant to "make it clear that those without shelter *could* engage in the involuntary acts of sleeping or resting in the City's parks." Shortly after the City removed "sleeping"

from the "camping" definition, Plaintiffs moved to certify a class. Plaintiffs requested certification of a class defined as

> All involuntarily homeless individuals living in Grants Pass, Oregon, including homeless individuals who sometimes sleep outside city limits to avoid harassment and punishment by [the City] as addressed in this lawsuit.

Plaintiffs' class certification motion was accompanied by a declaration from the Chief Operating Officer and Director of Housing and Homeless Services for United Community Action Network ("UCAN"), a non-profit organization that serves homeless people in Josephine County, the county where the City is located.[6] UCAN had recently conducted a "point-in-time count of homeless individuals in Josephine County."[7] Based on that count, the Chief Operating Officer's declaration stated "[h]undreds of [homeless]

---

[6] The Department of Housing and Urban Development regulations impose obligations on the "continuum of care," which is defined as "the group composed of representatives of relevant organizations . . . that are organized to plan for and provide, as necessary, a system of outreach, engagement, and assessment . . . to address the various needs of homeless persons and persons at risk of homelessness for a specific geographic area." 24 C.F.R. § 576.2.

[7] As the "continuum of care" in the City, UCAN was required to conduct point-in-time counts ("PIT counts") of homeless persons within that geographic area. 24 C.F.R. § 578.7(c)(2). PIT counts measure the number of sheltered and unsheltered homeless individuals on a single night. 24 C.F.R. § 578.7(c)(2). The *Martin* court relied on PIT counts conducted by local non-profits to determine the number of homeless people in the jurisdiction. *See Martin*, 920 F.3d at 604. Courts and experts note that PIT counts routinely undercount homeless persons, but they appear to be the best available source of data on homelessness. *See, e.g.*, *id.*

people live in Grants Pass," and "almost all of the homeless people in Grants Pass are involuntarily homeless. There is simply no place in Grants Pass for them to find affordable housing or shelter. They are not choosing to live on the street or in the woods."

The City opposed class certification, arguing Plaintiffs had not provided sufficient evidence to meet any of the requirements for certifying a class. The district court disagreed and certified the class proposed by Plaintiffs. The parties proceeded with discovery and filed cross-motions for summary judgment.

At the time the parties filed their summary judgment motions, there were only four locations in the City that temporarily housed homeless persons, which proved inadequate. One location was run by the Gospel Rescue Mission, an explicitly religious organization devoted to helping the poor. The Gospel Rescue Mission operated a facility for single men without children, and another facility for women, including women with children. These two facilities required residents to work at the mission six hours a day, six days a week in exchange for a bunk for 30 days. Residents were required to attend an approved place of worship each Sunday and that place of worship had to espouse "traditional Christian teachings such as the Apostles Creed." Disabled persons with chronic medical or mental health issues that prevented them from complying with the Mission's rules were prohibited.[8]

---

[8] Multiple class members submitted uncontested declarations to the district court stating they did not stay at the Gospel Rescue Mission because they suffer from disqualifying disabilities and/or were unwilling to attend church.

In addition to the Gospel Rescue Mission, the City itself operated a "sobering center" where law enforcement could transport intoxicated or impaired persons. That facility consisted of twelve locked rooms with toilets where intoxicated individuals could sober up. The rooms did not have beds. The City also provided financial support to the Hearts with a Mission Youth Shelter, an 18-bed facility where unaccompanied minors aged 10 to 17 could stay for up to 72 hours, and could stay even longer if they had parental consent.

Finally, on nights when the temperature was below 30 degrees (or below 32 degrees with snow), UCAN operated a "warming center" capable of holding up to 40 individuals. That center did not provide beds. The center reached capacity on every night it operated except the first night it opened, February 3, 2020. Between February 3 and March 19, 2020, the warming center was open for 16 nights. The center did not open at all during the winter of 2020–2021.

Presented with evidence of the number of homeless persons and the shelter spaces available, the district court concluded "[t]he record is undisputed that Grants Pass has far more homeless individuals than it has practically available shelter beds." The court then held that, based on the unavailability of shelter beds, the City's enforcement of its anti-camping and anti-sleeping ordinances violated the Cruel and Unusual Punishment Clause. The fact that *Martin* involved criminal violations while the present case involved initial civil violations that matured into criminal violations made "no difference for Eight Amendment purposes." Next, the court held the system of fines violated the Eighth

Amendment's Excessive Fines Clause.[9]  Finally, the court held the appeals process for park exclusions violated procedural due process under the Due Process Clause of the Fourteenth Amendment.

In reaching its decision the district court was careful to point out that, consistent with *Martin*, the scope of its decision was limited.  The court's order made clear that the City was not required to provide shelter for homeless persons and the City could still limit camping or sleeping at certain times and in certain places.  The district court also noted the City may still "ban the use of tents in public parks," "limi[t] the amount of bedding type materials allowed per individual," and pursue other options "to prevent the erection of encampments that cause public health and safety concerns."[10]

Approximately one month after the summary judgment order, the district court issued a judgment which included a

---

[9] Part of the City's argument on this issue was that the fines are not mandatory because state court judges retain discretion not to impose fines.  This is inconsistent with the text of the ordinances and not supported by the record.  The provision of the municipal code defining penalties for ordinance violations clarifies that the fines are mandatory.  It provides, the fines "*shall* be $295" and "*shall* be $75."  GPMC 1.36.010(J)–(K) (emphasis added).  Conversely, it is only discretionary to reduce fines because the relevant ordinance provides that, "[u]pon a plea of guilty . . . the penalty *may* be reduced" to the amount listed for a first or second offense.  *Id.* (emphasis added)*.*  After a second citation, there is no authority within the municipal code that permits judges to reduce fines, and there is no evidence in the record demonstrating circuit court judges have reduced fines except pursuant to GPMC 1.36.010.

[10] The district court denied summary judgment on other claims brought by Plaintiffs.  Those claims were subsequently voluntarily dismissed.

permanent injunction that provided a complicated mix of relief. First, the district court declared the ordinance regarding the appeals of park exclusions failed to provide "adequate procedural due process," but that ordinance was not permanently enjoined. Instead, the district court enjoined only the enforcement of the underlying park exclusion ordinance. Next, the district court declared enforcement of the anti-sleeping and anti-camping ordinances against class members "violates the Eighth Amendment prohibition against cruel and unusual punishment" and "violates the Eighth Amendment prohibition against excessive fines." Without explanation, however, the district court did not enjoin those ordinances in their entirety. Rather, the district court entered no injunctive relief regarding the anti-sleeping ordinance. But the district court permanently enjoined enforcement of the anti-camping ordinances, as well as an ordinance regarding "criminal trespassing on city property related to parks," in all City parks at night except for one park where the parties agreed the injunction need not apply.[11] The district court also permanently enjoined enforcement of the anti-camping ordinances during daytime hours unless an initial warning was given "at least 24 hours before enforcement." Accordingly, under the permanent injunction, the anti-camping ordinances may be enforced under some circumstances during the day, but never at night.

The City appealed and sought initial en banc review to clarify the scope of *Martin*. The petition for initial hearing en banc was denied.

---

[11] The City ordinance regarding "criminal trespass" was never at issue in the litigation until the permanent injunction. Plaintiffs explain it was included in the injunction "[b]y agreement of the parties."

## II.

The core issue involving enforcement of the anti-camping ordinances is governed in large part by *Martin*. While there are some differences between *Martin* and the present case, the City has not identified a persuasive way to differentiate its anti-camping ordinances from the questioned ordinances in *Martin*. Therefore, the district court's ruling that the Cruel and Unusual Punishment Clause bars enforcement of the anti-camping ordinances will be mostly affirmed. We need not address the potential excessiveness of the fines issue or whether Plaintiffs adequately pled their due process challenge.

Our analysis proceeds in five parts. First, we reject the City's argument that the district court lacked jurisdiction.[12] Second, we find no abuse of discretion in the district court's certification of a class of involuntarily homeless persons. Third, we agree with the district court that at least portions of the anti-camping ordinance violate the Cruel and Unusual Punishment clause under *Martin*. Fourth, we conclude there is no need to resolve whether the fines violate the Excessive Fines clause. Fifth, we hold it is unnecessary to decide Plaintiffs' procedural due process claim.

## A.

Standing and mootness are questions of law that we review de novo. *Hartman v. Summers*, 120 F.3d 157, 159 (9th Cir. 1997); *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003). "Federal courts must determine that they have

---

[12] However, we vacate summary judgment and remand as to the anti-sleeping ordinance to afford the district court the opportunity to substitute a class representative in place of Debra Blake, who passed away while this matter was on appeal.

jurisdiction before proceeding to the merits," and plaintiffs must demonstrate standing as a necessary component of jurisdiction. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). To have Article III standing, a plaintiff must show (1) a concrete and particularized injury, (2) caused by the challenged conduct, (3) that is likely redressable by a favorable judicial decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). For purposes of injunctive relief, "[a]bstract injury is not enough"—the plaintiff must have sustained or be in immediate danger "of sustaining some direct injury as the result of the challenged" law. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (quotation marks and citation omitted).

The City's appellate briefing makes two standing arguments. First, the City argues Plaintiffs' claims are now moot because Plaintiffs no longer face a risk of injury based on the City's changed behavior after *Martin*. Second, the City argues Plaintiffs have not identified any relief that is within a federal court's power to redress. Both arguments are without merit.

A claim becomes moot, and no longer justiciable in federal court, if it has been remedied independent of the court. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013). There is abundant evidence in the record establishing homeless persons were injured by the City's enforcement actions in the past. The City argues, however, that it made changes after *Martin* such that there is no longer a threat of future injury. The problem for the City is that voluntary cessation of challenged practices rarely suffices to moot a case and, in any event, there is evidence the challenged practices have continued after *Martin*.

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of

its power to determine the legality of the practice.'" *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). This is so "because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). Thus, the City "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. Instead of the City making it "absolutely clear" it has stopped enforcement activities, the record shows ongoing enforcement.

The parties diverge substantially on how to characterize the degree of enforcement after *Martin* was issued in September 2018. The City argued in its briefing and at oral argument that it has largely complied with *Martin*, noting the 2019 amendment to an anti-camping ordinance, that citations were issued "sparingly" in 2019, and in particular it says it issued only two citations during the late evening and early morning since *Martin*. The City supports its petition with a declaration from a City police officer stating "[i]t is the regular practice of every officer I know of on this department to enforce these Ordinances sparingly and in recognition of the different circumstances we encounter." As for Plaintiffs, they offered evidence showing enforcement continued after *Martin* such that class members received citations and exclusion orders for camping or sleeping and were prosecuted for criminal trespass between the point the lawsuit was filed and the close of discovery.

Although the record does show the rate of enforcement of the various ordinances decreased since *Martin*, even accepting the City's position the evidence is undisputed that

enforcement continued.[13]  It is plainly inaccurate for the City to claim all enforcement ceased.  The ongoing enforcement activities establish the City did not meet its "formidable burden" of showing the challenged activities will not recur. *Friends of the Earth*, 528 U.S. at 190.  The City's mootness argument fails.[14]

The City's other jurisdictional argument is that Plaintiffs' claims are not redressable.  According to the City,

---

[13] The City also argues "there was no evidence that anyone was ever cited for the simple act of sleeping in a City park" after *Martin*.  But the citation issued to Dolores Nevin in late December 2019 pursuant to the City's "criminal trespass" ordinance included a narrative explaining, "[d]uring an area check of Riverside Park, Dolores Nevin was found *sleeping* during closed hours.  Nevin, who has been warned in the past, was issued a citation for Trespass on City Property."  (emphasis added).  And on September 11, 2019, Grants Pass Police Officer Jason McGinnis issued citations to Debra Blake and Carla Thomas for being in Riverside Park at approximately 7:30 a.m. with sleeping bags and belongings spread around themselves.  Other individuals cited for camping in a city park in 2019 include class members: Gail Laine, William Stroh, Dawn Schmidt, Cristina Trejo, Kellie Parker, Colleen Bannon, Amanda Sirnio, and Michael and Louana Ellis.

[14] Mootness was also considered during the *Martin* litigation.  *See Bell v. City of Boise*, 709 F.3d 890, 898, 900–01 (9th Cir. 2013).  The City of Boise argued that a combination of an amended definition of "camping" in the ordinance and a "Special Order," prohibiting police officers from enforcing the ordinances when a person is on public property and there is no available overnight shelter, mooted the case.  *Id.* at 894–95.  We rejected the argument that the change to the definition of "camping" rendered the case moot because "[m]ere clarification of the Camping Ordinance does not address the central concerns of the Plaintiffs' Eighth Amendment claims"—that the ordinance "effectively criminalized their status as homeless individuals."  *Id.* at 898 n.12.  And we held the adoption of a "Special Order" did not moot the case because the Special Order was not a legislative enactment, and as such it "could be easily abandoned or altered in the future."  *Id.* at 901.

any possible relief intrudes inappropriately upon matters of policy best left to executive and legislative discretion. We disagree. Consistent with *Martin*, the district court granted limited relief enjoining enforcement of a few municipal ordinances at certain times, in certain places, against certain persons. None of the cases cited by the City credibly support its argument that the district court injunction overstepped the judiciary's limited authority under the Constitution. Contrary to the City's position, enjoining enforcement of a few municipal ordinances aimed at involuntarily homeless persons cannot credibly be compared to an injunction seeking to require the federal government to "phase out fossil fuel emissions and draw down excess atmospheric CO2." *Juliana v. United States*, 947 F.3d 1159, 1164–65 (9th Cir. 2020). The relief sought by Plaintiffs was redressable within the limits of Article III. *See Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (holding a plaintiff's burden to demonstrate redressability is "relatively modest") (citation omitted).

Finally, we raise *sua sponte* the possibility that the death of class representative Debra Blake while this matter was on the appeal has jurisdictional significance. *Cf. Fort Bend Cty. v. Davis*, 139 S.Ct. 1843, 1849 (2019) (holding courts must raise issues of subject matter jurisdiction *sua sponte*). We hold Blake's death does not moot the class's claims as to all challenged ordinances except possibly the anti-sleeping ordinance. As to that ordinance, we remand to allow the district court the opportunity to substitute a class representative in Blake's stead.

With respect to the park exclusion, criminal trespass, and anti-camping ordinances, the surviving class representatives,

Gloria Johnson[15] and John Logan,[16] have standing in their own right.    Although they live in their cars, they risk

---

[15] The dissent suggests Gloria Johnson does not have standing to challenge the park exclusion and criminal trespass ordinances. Dissent 65–66.  The dissent concedes, however, Johnson has standing to challenge the anti-camping ordinances, GPMC 5.61.030, 6.46.090.  But the dissent does not provide a meaningful explanation why it draws this distinction between the ordinances that work in concert.  It is true Johnson has not received a park exclusion order and has not been charged with criminal trespass in the second degree. However, there is little doubt that her continued camping in parks would lead to a park exclusion order and, eventually, criminal trespass charges. Johnson is positioned to bring a pre-enforcement challenge against the park exclusion and criminal trespass ordinances, because they will be used against her given the undisputed fact that she remains involuntarily homeless in Grants Pass. She established a credible threat of future enforcement under the anti-camping ordinances which creates a credible threat of future enforcement under the park exclusion and criminal trespass ordinances.

[16] The dissent claims John Logan has not established standing. Dissent 63–65.  During the course of this case, Logan submitted two declarations.  At the class certification stage, his declaration stated he "lived out of [his] truck on the streets in Grants Pass for about 4 years." During that time, he was "awakened by City of Grants Pass police officer and told that I cannot sleep in my truck anywhere in the city and ordered to move on." To avoid those encounters, Logan "usually sleep[s] in [his] truck just outside the Grants Pass city limits."  However, Logan stated "[i]f there was some place in the city where [he] could legally sleep in [his] truck, [he] would because it would save valuable gas money and avoid . . . having to constantly move." Logan also explained he has "met dozens, if not hundreds, of homeless people in Grants Pass" over the years who had been ticketed, fined, arrested, and criminally prosecuted "for living outside." At summary judgment, Logan submitted a declaration stating he is "currently involuntarily homeless in Grants Pass and sleeping in [his] truck at night at a rest stop North of Grants Pass." He stated he "cannot sleep in the City of Grants Pass for fear that [he] will be awakened, ticketed, fined, moved along, trespassed and charged with Criminal Trespass."  The dissent reads this evidence as indicating Logan failed to "provide[] any facts to establish" that he is likely to be issued a citation under the challenged ordinances. Dissent 64. We do

enforcement under all the same ordinances as Blake and the class (with the exception of the anti-sleeping ordinance, GPMC 5.61.020, which cannot be violated by sleeping in a car) and have standing in their own right as to all ordinances except GPMC 5.61.020.

With respect to the anti-sleeping ordinance, the law is less clear. Debra Blake is the only class representative who had standing in her own right to challenge the anti-sleeping ordinance. Under cases such as *Sosna v. Iowa*, 419 U.S. 393, 401 (1975), and *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747 (1976), a class representative may pursue the live claims of a properly certified class—without the need to remand for substitution of a new representative[17]—even

---

not agree. The undisputed facts establish Logan is involuntarily homeless. When he slept in Grants Pass, he was awoken by police officers and ordered to move. His personal knowledge was that involuntarily homeless individuals in Grants Pass often are cited under the challenged ordinances and Grants Pass continues to enforce the challenged ordinances. And, but for the challenged ordinances, Logan would sleep in the city. Therefore, as the district court found, it is sufficiently likely Logan would be issued a citation that Logan's standing is established. That is especially true given the Supreme Court's instruction that a plaintiff need not wait for "an actual arrest, prosecution, or other enforcement action" before "challenging [a] law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Finally, even if Logan had not demonstrated standing, the dissent's analysis regarding Logan is irrelevant because this case could proceed solely based on the standing established by Gloria Johnson and the class. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d at 985 (9th Cir. 2007) (en banc).

[17] *See Sosna*, 419 U.S. at 403 ("[W]e believe that the test of Rule 23(a) is met."); *id.* at 416–17 (White, J., dissenting) ("It is claimed that the certified class supplies the necessary adverse parties for a continuing case or controversy . . . The Court cites no authority for this retrospective decision as to the adequacy of representation which seems to focus on the competence of counsel rather than a party plaintiff who is a

after his own claims become moot, provided that several requirements are met.**[18]**  *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 987–88 (9th Cir. 2007) (en banc).  If Debra Blake's challenge to the anti-sleeping ordinance became moot before she passed away, she could have continued to pursue the challenge on behalf of the class under the doctrine of *Sosna*.  But we have not found any case applying *Sosna* and *Franks* to a situation such as this, in which the death of a representative causes a class to be unrepresented as to part (but not all) of a claim.  The parties did not brief this issue and no precedent indicates whether this raises a jurisdictional question, which would deprive us of authority to review the merits of the anti-sleeping ordinance challenge, or a matter of Federal Rule of Civil Procedure 23, which might not.

Because Plaintiffs have not moved to substitute a class representative pursuant to Federal Rule of Appellate Procedure 43(a) or identified a representative who could be substituted, because no party has addressed this question in briefing, and because we are not certain of our jurisdiction to consider the challenge to the anti-sleeping ordinance, we think it appropriate to vacate summary judgment as to the

representative member of the class.  At the very least, the case should be remanded to the District Court.").

**[18]** The class must be properly certified, *see Franks*, 424 U.S. at 755–56, or the representative must be appealing denial of class certification.  *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980).  The class representative must be a member of the class with standing to sue at the time certification is granted or denied.  *See Sosna*, 419 U.S. at 403.  The unnamed class members must still have a live interest in the matter throughout the duration of the litigation.  *See Franks*, 424 U.S. at 755.  And the court must be satisfied that the named representative will adequately pursue the interests of the class even though their own interest has expired.  *See Sosna*, 419 U.S. at 403.

anti-sleeping ordinance and remand to determine whether a substitute representative is available as to that challenge alone. *See Cobell v. Jewell*, 802 F.3d 12, 23–24 (D.C. Cir. 2015) (discussing substitution of a party during appeal). Substitution of a class representative may significantly aid in the resolution of the issues in this case. Remand will not cause significant delay because, as we explain below, remand is otherwise required so that the injunction can be modified. In the absence of briefing or precedent regarding this question, we do not decide whether this limitation is jurisdictional or whether it arises from operation of Rule 23.

We therefore hold the surviving class representatives at a minimum have standing to challenge every ordinance except the anti-sleeping ordinance. As to the anti-sleeping ordinance, we vacate summary judgment and remand for the district court to consider in the first instance whether an adequate class representative, such as class member Dolores Nevin, exists who may be substituted.

**B.**

The City's next argument is the district court erred in certifying the class. We "review a district court's order granting class certification for abuse of discretion, but give the district court 'noticeably more deference when reviewing a grant of class certification than when reviewing a denial.'" *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir. 2019) (internal citation omitted) (quoting *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115 (9th Cir. 2017)). Factual findings underlying class certification are reviewed for clear error. *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014).

A member of a class may sue as a representative party if the member satisfies Federal Rule of Civil Procedure 23(a)'s four prerequisites: numerosity, commonality, typicality, and

adequacy of representation.  Fed. R. Civ. P. 23(a); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).  Assessing these requirements involves "rigorous analysis" of the evidence.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

If the initial requirements of Rule 23(a) are met, a putative class representative must also show the class falls into one of three categories under Rule 23(b).  Plaintiffs brought this suit under Rule 23(b)(2), seeking injunctive or declaratory relief based on the City having "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

The district court found the Rule 23(a) requirements satisfied and certified a class under Rule 23(b)(2).  The City's arguments against this class certification are obscure. It appears the City's argument is that class certification was an abuse of discretion because the holding of *Martin* can only be applied after an individualized inquiry of each alleged involuntarily homeless person's access to shelter.[19] The City appears to suggest the need for individualized inquiry defeats numerosity, commonality, and typicality. While we acknowledge the *Martin* litigation was not a class action, nothing in that decision precluded class actions.[20]

---

[19] There is no reason to believe the putative class members are voluntarily homeless.  To the contrary, at least 13 class members submitted declarations to the district court indicating that they are involuntarily homeless.

[20] Other courts have certified similar classes.  *See e.g.*, *Lehr v. City of Sacramento*, 259 F.R.D. 479 (E.D. Cal. 2009) (addressing numerosity,

And based on the record in this case, the district court did not err by finding Plaintiffs satisfied the requirements of Rule 23 such that a class could be certified.

To satisfy the numerosity requirement a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). For purposes of this requirement, "'impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (quotation omitted). There is no specific number of class members required. *See Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). However, proposed classes of less than fifteen are too small while classes of more than sixty are sufficiently large. *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051–52 (9th Cir. 2003).

When the district court certified the class on August 7, 2019, it found there were at least 600 homeless persons in the City based on the 2018 and 2019 PIT counts conducted by UCAN. The City does not identify how this finding was clearly erroneous. In fact, the City affirmatively indicated to Plaintiffs prior to the class certification order that the number of homeless persons residing in Grants Pass for the past 7 years was "unknown." Further, the only guidance offered by the City regarding a specific number of class members came long after the class was certified. A City police officer claimed in a declaration that he was "aware of less than fifty

commonality, and typicality for homeless persons in Sacramento); *Joyce v. City & Cty. of S.F.*, 1994 WL 443464 (N.D. Cal. Aug. 4, 1994), *dismissed as moot*, 87 F.3d 1320 (9th Cir. 1996) (finding typicality despite some differences among homeless class members); *Pottinger v. City of Miami*, 720 F.Supp. 955, 960 (S.D. Fla. 1989) (certifying a class of homeless persons).

individuals total who do not have access to any shelter" in the City. The officer admitted, however, it "would be extremely difficult to accurately estimate the population of people who are homeless in Grants Pass regardless of the definition used."

The officer's guess of "less than fifty" homeless persons is inconsistent with the general understanding that PIT counts routinely undercount homeless persons. *See Martin*, 920 F.3d at 604 ("It is widely recognized that a one-night point in time count will undercount the homeless population.") (internal quotation marks omitted). But even accepting the officer's assessment that there were approximately fifty homeless persons in the City, the numerosity requirement is satisfied. Joining approximately fifty persons might be impracticable and especially so under the facts here because homeless persons obviously lack a fixed address and likely have no reliable means of communications.[21] At the very least, the district court did

---

[21] Moreover, there is a well-documented correlation between physical and mental illness and homelessness. *See, e.g.*, Sara K. Rankin, *Punishing Homelessness*, 22 N. CRIM. L. REV. 99, 105 (2019) ("Psychiatric disorders affect at least 30 to 40 percent of all people experiencing homelessness."); Stefan Gutwinski et al., *The prevalence of mental disorders among homeless people in high-income countries: An updated systematic review and meta-regression analysis*, 18(8) PLOS MED. 1, 14 (Aug. 23, 2021), ("Our third main finding was high prevalence rates for treatable mental illnesses, with 1 in 8 homeless individuals having either major depression (12.6%) or schizophrenia spectrum disorders (12.4%). This represents a high rate of schizophrenia spectrum disorders among homeless people, and a very large excess compared to the 12-month prevalence in the general population, which for schizophrenia is estimated around 0.7% in high-income countries."); Greg A. Greenberg & Robert A. Rosenheck, *Jail Incarceration, Homelessness, and Mental Health: A National Study*, 59 PSYCHIATRIC SERVS. 170, 170 (2008) ("Homeless individuals may also be more likely

not abuse its discretion in concluding the numerosity requirement was met.

A class satisfies Rule 23's commonality requirement if there is at least one question of fact or law common to the class. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013). The Supreme Court has said the word "question" in Rule 23(a)(2) is a misnomer: "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis and omission in original). "[C]lass members' claims [must] 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza*, 666 F.3d at 588 (quoting *Wal-Mart*, 564 U.S. at 350).

As correctly identified by the district court, Plaintiffs' claims present at least one question and answer common to the class: "whether [the City's] custom, pattern, and practice of enforcing anti-camping ordinances, anti-sleeping ordinances, and criminal trespass laws . . . against involuntarily homeless individuals violates the Eighth Amendment of the Constitution." An answer on this

---

to have health conditions . . . Severe mental illness is also more prevalent among homeless people than in the general population."); CTR. FOR DISEASE CONTROL & PREVENTION, HOMELESSNESS AS A PUBLIC HEALTH LAW ISSUE: SELECTED RESOURCES (Mar. 2, 2017) ("Homelessness is closely connected to declines in physical and mental health; homeless persons experience high rates of health problems such as HIV infection, alcohol and drug abuse, mental illness, tuberculosis, and other conditions.").

question resolved a crucial aspect of the claims shared by all class members.

The City argues the commonality requirement was not met because some class members might have alternative options for housing, or might have the means to acquire their own shelter.[22] But this argument misunderstands the class definition. Pursuant to the class definition, the class includes only *involuntarily* homeless persons.[23] Individuals who

---

[22] The dissent adapts the City's argument that enforcement of the anti-camping ordinances depends on individual circumstances and is therefore not capable of resolution on a common basis. Dissent 72. That misunderstands how the present class was structured. The dissent attempts to reframe the common question as a very general inquiry. It appears the dissent interprets the question whether an Eighth Amendment violation must be determined by an individualized inquiry as whether each individual is "involuntarily homeless." To assess that, a court would have to conduct an individualized inquiry and determine if an individual was "involuntarily homeless." But that is not the common question in this case. Rather, the question is whether the City's enforcement of the anti-camping ordinances against all involuntarily homeless individuals violates the Eighth Amendment. This question is capable of common resolution on a prospective class-wide basis, as the record establishes.

[23] The dissent argues this created a prohibited "fail safe" class. That is erroneous. As noted in a recent en banc decision, "a 'fail safe' class . . . is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc). Such classes are prohibited "because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id. See also Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (noting a fail safe class "is one that is defined so narrowly as to preclude[ ] membership unless the liability of the defendant is established"). No such class is present here. The class was defined, in relevant part, as "[a]ll involuntarily homeless individuals living in Grants Pass." Membership in that class has no

have shelter or the means to acquire their own shelter simply are never class members.[24]  Because we find there existed at least one question of law or fact common to the class, the district court did not abuse its discretion in concluding commonality was satisfied.

Typicality asks whether "the claims or defenses of the representative parties are typical" of the class.  Fed. R. Civ. P. 23(a)(3).  Typicality is a "permissive standard[]."  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation omitted).  It "refers to the nature of the claim or defense of the class representative, and not to the specific facts from

---

connection to the success of the underlying claims.  Put differently, the class would have consisted of exactly the same population whether Grants Pass won or lost on the merits.  The obvious illustration of this is the class population would not change if a court determined the anti-camping ordinance violated the Eighth Amendment while the anti-sleeping ordinance did not. In that situation, class members would not be "defined out of the class." *Olean*, 31 F.4th at 669 n.14 (citation omitted). Rather, class members would be "bound by the judgment" regarding the anti-sleeping ordinance. *Id.* In any event, the dissent's concerns regarding individualized determinations are best made when the City attempts to enforce its ordinances. *Cf. McArdle v. City of Ocala*, 519 F.Supp.3d 1045, 1052 (M.D. Fla. 2021) (requiring that officers inquire into the availability of shelter space before an arrest could be made for violation of the City's "open lodging" ordinance).  If it is determined at the enforcement stage that a homeless individual has access to shelter, then they do not benefit from the injunction and may be cited or prosecuted under the anti-camping ordinances.  Moreover, as we noted above, several classes of homeless individuals have been certified in this past. *See supra* note 18.

[24] We do not, as the dissent contends, "suggest[ ] that the class definition requires only an involuntary lack of access to regular or permanent shelter to qualify as 'involuntarily homeless.'" Dissent 77–78.  It is unclear where the dissent finds this in the opinion.  To be clear: A person with access to temporary shelter is not involuntarily homeless unless and until they no longer have access to shelter.

which it arose or the relief sought." *Parsons*, 754 F.3d at 685 (citation omitted).

The class representatives' claims and defenses are typical of the class in that they are homeless persons who claim that the City cannot enforce the challenged ordinances against them when they have no shelter. The defenses that apply to class representatives and class members are identical. The claims of class representatives and class members are similar, except that some class representatives live in vehicles while other class members may live on streets or in parks, not vehicles. This does not defeat typicality. The class representatives with vehicles may violate the challenged ordinances in a different manner than some class members—*i.e.*, by sleeping in their vehicle, rather than on the ground. But they challenge the same ordinances under the same constitutional provisions as other class members. *Cf. Staton*, 327 F.3d at 957 ("[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical.") (citation omitted). The district court did not abuse its discretion in finding the typicality requirement met.

The City does not present any other arguments regarding class certification, such as the propriety of certifying the class as an injunctive class under Rule 23(b)(2). We do not make arguments for parties and the arguments raised by the City regarding class certification fail.

## C.

Having rejected the City's jurisdictional arguments, as well as its arguments regarding class certification, the merits can be addressed. The City's merits arguments regarding the Cruel and Unusual Punishment Clause take two forms. First,

the City argues its system of imposing civil fines cannot be challenged as violating the Cruel and Unusual Clause because that clause provides protection only in criminal proceedings, after an individual has been convicted.  That is incorrect.  Second, the City argues *Martin* does not protect homeless persons from being cited under the City's amended anti-camping ordinance which prohibits use of any bedding or similar protection from the elements.  The City appears to have conceded it cannot cite homeless persons merely for sleeping in public but the City maintains it is entitled to cite individuals for the use of rudimentary bedding supplies, such as a blanket, pillow, or sleeping bag "for bedding purposes." *See* GPMC 5.61.010(B).  Again, the City is incorrect.  Here, we focus exclusively on the anti-camping ordinances.

According to the City, citing individuals under the anti-camping ordinances cannot violate the Cruel and Unusual Punishment Clause because citations under the ordinances are civil and civil citations are "categorically not 'punishment' under the Eight Amendment."[25]  The City explains "the simple act of issuing a civil citation with a court date [has never] been found to be unconstitutional 'punishment' under the Eighth Amendment."  While not entirely clear, the City appears to be arguing the Cruel and Unusual Punishment Clause provides no protection from

---

[25] This position is in significant tension with the City's actions taken immediately after *Martin* was issued.  As noted earlier, the City amended its anti-camping ordinance "in direct response to *Martin v. Boise*" to allow for "the act of 'sleeping'" in City parks.  If the City believed *Martin* has no impact on civil ordinances, it is unclear why the City believed a curative "response" to *Martin* was necessary.

citations categorized as "civil" by a governmental authority.[26]

Plaintiffs' focus on civil citations does involve an extra step from the normal Cruel and Unusual Clause analysis and the analysis of *Martin*. Usually, claims under the Cruel and Unusual Clause involve straightforward criminal charges. For example, the situation in *Martin* involved homeless persons allegedly violating criminal ordinances and the opinion identified its analysis as focusing on the "criminal" nature of the charges over ten times. 920 F.3d at 617. Here, the City has adopted a slightly more circuitous approach than

---

[26] The primary support for this contention is *Ingraham v. Wright*, 430 U.S. 651 (1977). In *Ingraham*, the Supreme Court addressed whether the Cruel and Unusual Punishment Clause was implicated by corporal punishment in public schools. The Court stated the Cruel and Unusual Punishment Clause limits "the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such." *Id.* at 667. The Court interpreted the challenge to corporal punishment as, in effect, asserting arguments under only the first or second limitation. That is, the challenge was whether "the paddling of schoolchildren" was a permissible amount or type of punishment. *Id.* at 668. The *Ingraham* decision involved no analysis or discussion of the third limitation, *i.e.* the "substantive limits on what can be made criminal." *Id.* at 667. Thus, it was in the context of evaluating the amount or type of punishment that *Ingraham* stated "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Id.* at 671 n.40. When, as here, plaintiffs are raising challenges to the "substantive limits on what can be made criminal," *Ingraham* does not prohibit a challenge before a criminal conviction. *See Martin*, 920 F.3d at 614 ("*Ingraham* did not hold that a plaintiff challenging the state's power to criminalize a particular status or conduct in the first instance, as the plaintiffs in this case do, must first be convicted.").

simply establishing violation of its ordinances as criminal offenses. Instead, the City issues civil citations under the ordinances. If an individual violates the ordinances twice, she can be issued a park exclusion order. And if the individual is found in a park after issuance of the park exclusion order, she is cited for criminal trespass. *See* O.R.S. 164.245 (criminal trespass in the second degree). Multiple City police officers explained in their depositions this sequence was the standard protocol. The holding in *Martin* cannot be so easily evaded.

*Martin* held the Cruel and Unusual Punishment clause "prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." 920 F.3d at 616. A local government cannot avoid this ruling by issuing civil citations that, later, become criminal offenses. A recent decision by the en banc Fourth Circuit illustrates how the Cruel and Unusual Punishment Clause looks to the eventual criminal penalty, even if there are preliminary civil steps.

The disputes in *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) (en banc) arose from a Virginia law which allowed a state court to issue a civil order identifying an individual as a "habitual drunkard." *Id.* at 268. Once labeled a "habitual drunkard," the individual was "subject to incarceration for the mere possession of or attempt to possess alcohol, or for being drunk in public." *Id.* at 269. A group of homeless alcoholics filed suit claiming, among other theories, the "habitual drunkard" scheme violated the Cruel and Unusual Punishment Clause. In the plaintiffs' view, the scheme resulted in criminal prosecutions based on their "status," *i.e.* alcoholism. *See id.* at 281.

Using reasoning very similar to that in *Martin*, the Fourth Circuit found the statutory scheme unconstitutional because

it provided punishment based on the plaintiffs' status.  Of particular relevance here, the Fourth Circuit reasoned the fact that Virginia's "scheme operate[d] in two steps" did not change the analysis.  *Id.* 283.  Issuing a civil order first, followed by a criminal charge, was a "two-pronged statutory scheme" potentially "less direct" than straightforwardly criminalizing the status of alcohol addiction.  *Id.*  But the scheme remained unconstitutional because it "effectively criminalize[d] an illness."  *Id.* The fact that Virginia "civilly brands alcoholics as 'habitual drunkards' before prosecuting them for involuntary manifestations of their illness does nothing to cure the unconstitutionality of this statutory scheme."  *Id.*

The same reasoning applies here.  The anti-camping ordinances prohibit Plaintiffs from engaging in activity they cannot avoid.  The civil citations issued for behavior Plaintiffs cannot avoid are then followed by a civil park exclusion order and, eventually, prosecutions for criminal trespass.  Imposing a few extra steps before criminalizing the very acts *Martin* explicitly says cannot be criminalized does not cure the anti-camping ordinances' Eighth Amendment infirmity.

The City offers a second way to evade the holding in *Martin*.  According to the City, it revised its anti-camping ordinances to allow homeless persons to sleep in City parks.  However, the City's argument regarding the revised anti-camping ordinance is an illusion.  The amended ordinance continues to prohibit homeless persons from using "bedding, sleeping bag, or other material used for bedding purposes," or using stoves, lighting fires, or erecting structures of any kind.  GPMC 5.61.010.  The City claims homeless persons

are free to sleep in City parks, but only without items necessary to facilitate sleeping outdoors.[27]

The discrepancy between sleeping without bedding materials, which is permitted under the anti-camping ordinances, and sleeping with bedding, which is not, is intended to distinguish the anti-camping ordinances from *Martin* and the two Supreme Court precedents underlying *Martin*, *Robinson v. California*, 370 U.S. 660 (1962) and *Powell v. Texas*, 392 U.S. 514 (1968). Under those cases, a person may not be prosecuted for conduct that is involuntary or the product of a "status." *See Martin*, 920 F.3d at 617 (citation omitted). The City accordingly argues that sleeping is involuntary conduct for a homeless person, but that homeless persons can choose to sleep without bedding materials and therefore can be prosecuted for sleeping *with* bedding.

In its order granting summary judgment, the district court correctly concluded the anti-camping ordinances violated the Cruel and Unusual Punishment Clause to the extent they prohibited homeless persons from "taking necessary minimal measures to keep themselves warm and dry while sleeping when there are no alternative forms of shelter available." The only plausible reading of *Martin* is

---

[27] The Grants Pass ordinance does not specifically define "bedding" but courts give the words of a statute or ordinance their "ordinary, contemporary, common meaning" absent an indication to the contrary from the legislature. *See Williams v. Taylor*, 529 U.S. 420, 431 (2000) (citation omitted). The Oxford English Dictionary defines "bedding" as "[a] collective term for the articles which compose a bed." OXFORD ENGLISH DICTIONARY. And "bed" is defined as "a place for sleeping." MERRIAM-WEBSTER COLLEGIATE DICTIONARY 108 (11th ed.). The City's effort to dissociate the use of bedding from the act of sleeping or protection from the elements is nonsensical.

that it applies to the act of "sleeping" in public, including articles necessary to facilitate sleep. In fact, *Martin* expressed concern regarding a citation given to a woman who had been found sleeping on the ground, wrapped in blankets. 920 F.3d at 618. *Martin* noted that citation as an example of the anti-camping ordinance being "enforced against homeless individuals who take even the most rudimentary precautions to protect themselves from the elements." *Id.* *Martin* deemed such enforcement unconstitutional. *Id.* It follows that the City cannot enforce its anti-camping ordinances to the extent they prohibit "the most rudimentary precautions" a homeless person might take against the elements.[28] The City's position that it is entitled to enforce a complete prohibition on "bedding, sleeping bag, or other material used for bedding purposes" is incorrect.

The dissent claims we have misread *Martin* by "completely disregard[ing] the *Powell* opinions on which *Martin* relied, which make unmistakably clear that an individualized showing of involuntariness is required." Dissent 75. The dissent concedes that pursuant to *Martin*, the City cannot impose criminal penalties on involuntarily homeless individuals for sitting, sleeping, or lying outside on public property. Dissent 56. Thus, our purported "complete disregard[ ]" for *Martin* is not regarding the central holding that local governments may not criminalize involuntary conduct. Rather, the dissent believes, based on its

---

[28] Grants Pass is cold in the winter. The evidence in the record establishes that homeless persons in Grants Pass have struggled against frostbite. Faced with spending every minute of the day and night outdoors, the choice to use rudimentary protection of bedding to protect against snow, frost, or rain is not volitional; it is a life-preserving imperative.

interpretation of the Supreme Court opinions underlying *Martin*, that the Eighth Amendment provides only "a case-specific affirmative defense" that can never be litigated on a class basis. Dissent 71. To reach this counterintuitive conclusion, the dissent reads limitations into *Robinson*, *Powell*, and *Martin* that are nonexistent.

In *Robinson*, the Supreme Court struck down, under the Eighth Amendment, a California law that made "it a criminal offense for a person to 'be addicted to the use of narcotics.'" *Robinson*, 370 U.S. at 666. The law was unconstitutional, the Court explained, because it rendered the defendant "continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State." *Id.*

Six years later, in *Powell*, the Court divided 4-1-4 over whether Texas violated the Eighth Amendment under *Robinson* by prosecuting an alcoholic for public drunkenness. In a plurality opinion, Justice Marshall upheld the conviction of Leroy Powell on the ground that he was not punished on the basis of his status as an alcoholic, but rather for the *actus reus* of being drunk in public. *Powell*, 392 U.S. at 535. Four justices dissented, in an opinion by Justice Fortas, on the ground that the findings made by the trial judge—that Powell was a chronic alcoholic who could not resist the impulse to drink—compelled the conclusion that Powell's prosecution violated the Eighth Amendment because Powell could not avoid breaking the law. *Id.* at 569–70 (Fortas, J., dissenting). Justice White concurred in the judgment. He stressed, "[i]f it cannot be a crime to have an irresistible compulsion to use narcotics, I do not see how it can constitutionally be a crime to yield to such a compulsion." *Id.* at 549 (White, J., concurring). However, the reason for Justice White's concurrence was that he felt *Powell* failed to prove his status as an alcoholic compelled

him to violate the law by appearing in public. *Id.* at 553 (White, J., concurring).

Pursuant to *Marks v. United States*, 430 U.S. 188 (1977), the narrowest position which gained the support of five justices is treated as the holding of the Court. In identifying that position, *Martin* held: "five Justices [in *Powell*] gleaned from *Robinson* the principle that 'that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being.'" *Martin*, 920 F.3d at 616 (quoting *Jones*, 443 F.3d at 1135). *Martin* did not—as the dissent alleges—hold that *Powell*'s "controlling opinion was Justice White's concurrence." Dissent 54. *See id.*, 920 F.3d at 616–17. It would have violated the rule of *Marks* to adopt portions of Justice White's concurrence that did not receive the support of five justices. The dissent claims Justice White's concurrence requires that the individual claiming a status must prove the status compels the individual to violate the law—here, that each homeless individual must prove their status as an involuntarily homeless person to avoid prosecution.[29] Dissent 53–56.

---

[29] The dissent's attempt to create a governing holding out of Justice White's concurrence is erroneous. By citing a word or two out of context in the *Powell* dissenting opinion (*e.g.*, "constitutional defense") our dissenting colleague argues both Justice White and the dissenting justices in *Powell* agreed any person subject to prosecution has, at most, "a case-specific affirmative 'defense.'" Dissent 53, 71. We disagree. Though status was litigated as a defense in the context of Leroy Powell's prosecution, no opinion in *Powell* held status may be raised only as a defense. The *Powell* plurality noted trial court evidence that Leroy Powell was an alcoholic, but that opinion contains no indication "status" may only be invoked as "a case-specific affirmative 'defense.'" As for Justice White, the opening paragraph of his concurrence indicates he was

The dissent claims this renders class action litigation inappropriate. But no opinion in either *Powell* or *Martin* discussed the propriety of litigating the constitutionality of such criminal statutes by way of a class action.[30]

---

primarily concerned not with how a status must be invoked but with the fact that certain statuses should be beyond the reach of the criminal law:

> If it cannot be a crime to have an irresistible compulsion to use narcotics, I do not see how it can constitutionally be a crime to yield to such a compulsion. Punishing an addict for using drugs convicts for addiction under a different name. Distinguishing between the two crimes is like forbidding criminal conviction for being sick with flu or epilepsy but permitting punishment for running a fever or having a convulsion. Unless Robinson is to be abandoned, the use of narcotics by an addict must be beyond the reach of the criminal law. Similarly, the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk.

*Powell*, 392 U.S. at 548–49 (White, J., concurring) (internal citation omitted). Finally, neither the remainder of Justice White's concurrence nor the dissenting opinion explicitly indicates one's status may only be invoked as a defense. Rather, Justice White and the dissenters simply agreed that, if Powell's status made his public intoxication involuntary, he could not be prosecuted. There is no conceivable way to interpret *Martin* as adopting our dissenting colleague's position that one's status must be invoked as a defense. But even assuming the burden must be placed on the party wishing to invoke a status, the class representatives established there is no genuine dispute of material fact they have the relevant status of being involuntarily homeless.

[30] Federal courts have certified classes of homeless plaintiffs in the past, *see supra* note 18, which counsels against the City's and the dissent's position that such classes are impermissible under Rule 23.

The law that the dissent purports to unearth in Justice White's concurrence is not the "narrowest ground" which received the support of five justices.  *No* opinion in *Powell* or *Martin* supports the dissent's assertion that *Powell* offers exclusively an "affirmative 'defense'" that cannot be litigated in a class action.[31]  Dissent 53, 71.  Although the dissent might prefer that these principles find support in the controlling law, they do not.  We thus do not misread *Martin* by failing to apply the principles found solely in Justice White's concurrence.  Rather, we adhere to the narrow holding of *Martin* adopting the narrowest ground shared by five justices in *Powell*: a person cannot be prosecuted for involuntary conduct if it is an unavoidable consequence of one's status.

In addition to erecting an absolute bar to class litigation of this sort, the dissent would also impose artificial limitations on claims brought pursuant to *Martin*.  The dissent concedes Gloria Johnson has standing to bring individual challenges to most of the City's ordinances.  But the dissent then speculates that Gloria Johnson may, in fact, not be involuntarily homeless in the City.  The dissent would insist that Gloria Johnson, for example, leave the City to

---

[31] As noted above, *Martin* did not hold homeless persons bear the burden of demonstrating they are involuntarily homeless.  *See supra* note 29.  Because the record plainly demonstrates Plaintiffs are involuntarily homeless, there similarly is no reason for us to determine what showing would be required.  We note, however, that some district courts have addressed circumstances in which the question of burden was somewhat relevant.  *See, e.g.*, *McArdle*, 519 F.Supp.3d at 1052 (requiring, based in part on *Martin*, that officers inquire into the availability of shelter space before making an arrest for violation of the City's "open lodging" ordinance); *Butcher v. City of Marysville*, 2019 WL 918203, at *7 (E.D. Cal. Feb. 25, 2019) (holding plaintiffs failed to make the "threshold showing" of pleading that there was no shelter capacity and that they had no other housing at the time of enforcement).

camp illegally on federal or state lands, provide the court an accounting of her finances and employment history, and indicate with specificity where she lived before she lost her job and her home. Dissent 78–80. There, of course, exists no law or rule requiring a homeless person to do any of these things. Gloria Johnson has adequately demonstrated that there is no available shelter in Grants Pass and that she is involuntarily homeless.

The undisputed evidence establishes Gloria Johnson is involuntarily homeless and there is undisputed evidence showing many other individuals in similar situations. It is undisputed that there are at least around 50 involuntarily homeless persons in Grants Pass, and PIT counts, which *Martin* relied on to establish the number of homeless persons in Boise, revealed more than 600. *See Martin*, 920 F.3d at 604. It is undisputed that there is no secular shelter space available to adults. Many class members, including the class representatives, have sworn they are homeless and the City has not contested those declarations. The dissent claims this showing is not enough, implying that Plaintiffs must meet an extremely high standard to show they are involuntarily homeless. Even viewed in the light most favorable to the City, there is no dispute of material fact that the City is home to many involuntarily homeless individuals, including the class representatives. In fact, neither the City nor the dissent has demonstrated there is even one *voluntarily* homeless individual living in the City.[32] In light of the undisputed

---

[32] The dissent claims we have "shifted the burden to the City to establish the voluntariness of the behavior targeted by the ordinances." Dissent 80 n.13 (emphasis omitted). To the contrary, as we have explained, we do not decide who would bear such a burden because undisputed evidence demonstrates Plaintiffs are involuntarily homeless. Rather, without deciding who would bear such a burden if involuntariness were subject to serious dispute, we note Plaintiffs have

facts in the record underlying the district court's summary judgment ruling that show Plaintiffs are involuntarily homeless, and the complete absence of evidence that Plaintiffs are voluntarily homeless, we agree with the district court that Plaintiffs such as Gloria Johnson are not voluntarily homeless and that the anti-camping ordinances are unconstitutional as applied to them unless there is some place, such as shelter, they can lawfully sleep.[33]

---

demonstrated involuntariness and there is no evidence in the record showing any class member has adequate alternative shelter.

[33] Following *Martin*, several district courts have held that the government may evict or punish sleeping in public in some locations, provided there are other lawful places within the jurisdiction for involuntarily homeless individuals to sleep. *See, e.g.*, *Shipp v. Schaaf*, 379 F.Supp.3d 1033, 1037 (N.D. Cal. 2019) ("However, even assuming (as Plaintiffs do) that [eviction from a homeless encampment by citation or arrest] might occur, remaining at a particular encampment on public property is not conduct protected by *Martin*, especially where the closure is temporary in nature."); *Aitken v. City of Aberdeen*, 393 F.Supp.3d 1075, 1082 (W.D. Wash. 2019) ("*Martin* does not limit the City's ability to evict homeless individuals from particular public places."); *Gomes v. Cty. of Kauai*, 481 F.Supp.3d 1104, 1109 (D. Haw. 2020) (holding the County of Kauai could prohibit sleeping in a public park because it had not prohibited sleeping on other public lands); *Miralle v. City of Oakland*, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018) (holding the City could clear out a specific homeless encampment because "*Martin* does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option"); *Le Van Hung v. Schaaf*, 2019 WL 1779584, at *5 (N.D. Cal. Apr. 23, 2019) (holding *Martin* does not "create a right for homeless residents to occupy indefinitely any public space of their choosing"). Because the City has not established any realistically available place within the jurisdiction for involuntarily homeless individuals to sleep we need not decide whether alternate outdoor space would be sufficient under *Martin*. The district court may consider this issue on remand, if it is germane to do so.

Our holding that the City's interpretation of the anti-camping ordinances is counter to *Martin* is not to be interpreted to hold that the anti-camping ordinances were properly enjoined in their entirety.  Beyond prohibiting bedding, the ordinances also prohibit the use of stoves or fires, as well as the erection of any structures.  The record has not established the fire, stove, and structure prohibitions deprive homeless persons of sleep or "the most rudimentary precautions" against the elements.[34]  Moreover, the record does not explain the City's interest in these prohibitions.[35]  Consistent with *Martin*, these prohibitions may or may not be permissible.  On remand, the district court will be required to craft a narrower injunction recognizing Plaintiffs' limited right to protection against the elements, as well as limitations when a shelter bed is available.[36]

---

[34] The dissent claims we establish "the right to use (at least) a tent." Dissent 82 n.15.  This assertion is obviously false.  The district court's holding that the City may still "ban the use of tents in public parks" remains undisturbed by our opinion.

[35] The dissent asserts, "it is hard to deny that *Martin* has 'generate[d] dire practical consequences for the hundreds of local governments within our jurisdiction, and for the millions of people that reside therein.'" Dissent 85 (quoting *Martin*, 920 F.3d at 594 (M. Smith, J., dissenting from denial of rehearing en banc)) (modification in original).  There are no facts in the record to establish that *Martin* has generated "dire" consequences for the City.  Our review of this case is governed only by the evidence contained in the record.

[36] The district court enjoined the park exclusion ordinance in its entirety.  The parties do not address this in their appellate briefing but, on remand, the district court should consider narrowing this portion as well because the park exclusion ordinance presumably may be enforced against Plaintiffs who engage in prohibited activity unrelated to their status as homeless persons.

**D.**

The district court concluded the fines imposed under the anti-sleeping and anti-camping ordinances violated the Eighth Amendment's prohibition on excessive fines. A central portion of the district court's analysis regarding these fines was that they were based on conduct "beyond what the City may constitutionally punish." With this in mind, the district court noted "[a]ny fine [would be] excessive" for the conduct at issue.

The City presents no meaningful argument on appeal regarding the excessive fines issue. As for Plaintiffs, they argue the fines at issue were properly deemed excessive because they were imposed for "engaging in involuntary, unavoidable life sustaining acts." The permanent injunction will result in no class member being fined for engaging in such protected activity. Because no fines will be imposed for protected activity, there is no need for us to address whether hypothetical fines would be excessive.

**E.**

The final issue is whether Plaintiffs properly pled their challenge to the park exclusion appeals ordinance. GPMC 6.46.355. That ordinance provided a mechanism whereby an individual who received an exclusion order could appeal to the City Council. Subsequent to the district court's order, the City amended its park exclusion appeals ordinance. Therefore, the district court's determination the previous ordinance violated Plaintiffs' procedural due process rights has no prospective relevance. Because of this, we need not decide if Plaintiffs adequately pled their challenge to the previous ordinance.

### III.

We affirm the district court's ruling that the City of Grants Pass cannot, consistent with the Eighth Amendment, enforce its anti-camping ordinances against homeless persons for the mere act of sleeping outside with rudimentary protection from the elements, or for sleeping in their car at night, when there is no other place in the City for them to go. On remand, however, the district court must narrow its injunction to enjoin only those portions of the anti-camping ordinances that prohibit conduct protected by *Martin* and this opinion. In particular, the district court should narrow its injunction to the anti-camping ordinances and enjoin enforcement of those ordinances only against involuntarily homeless person for engaging in conduct necessary to protect themselves from the elements when there is no shelter space available. Finally, the district court on remand should consider whether there is an adequate representative who may be substituted for Debra Blake.

We are careful to note that, as in *Martin*, our decision is narrow. As in *Martin*, we hold simply that it is "unconstitutional to [punish] simply sleeping *somewhere* in public if one has nowhere else to do so." *Martin*, 920 F.3d at 590 (Berzon, J., concurring in denial of rehearing en banc). Our decision reaches beyond *Martin* slightly. We hold, where *Martin* did not, that class certification is not categorically impermissible in cases such as this, that "sleeping" in the context of *Martin* includes sleeping with rudimentary forms of protection from the elements, and that *Martin* applies to civil citations where, as here, the civil and criminal punishments are closely intertwined. Our decision does not address a regime of purely civil infractions, nor

does it prohibit the City from attempting other solutions to the homelessness issue.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

COLLINS, Circuit Judge, dissenting:

In *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), we held that "the Eighth Amendment's prohibition on cruel and unusual punishment bars a city from prosecuting people criminally for sleeping outside on public property when those people have no home or other shelter to go to." *Id.* at 603. Even assuming that *Martin* remains good law, today's decision—which both misreads and greatly expands *Martin*'s holding—is egregiously wrong. To make things worse, the majority opinion then combines its gross misreading of *Martin* with a flagrant disregard of settled class-certification principles. The end result of this amalgamation of error is that the majority validates the core aspects of the district court's extraordinary injunction in this case, which effectively requires the City of Grants Pass to allow all but one of its public parks to be used as homeless encampments.[1]  I respectfully dissent.

---

[1] The majority's decision is all the more troubling because, in truth, the foundation on which it is built is deeply flawed: *Martin* seriously misconstrued the Eighth Amendment and the Supreme Court's caselaw construing it. *See infra* at 83–85. But I am bound by *Martin*, and— unlike the majority—I faithfully apply it here.

**I**

Because our opinion in *Martin* frames the issues here, I begin with a detailed overview of that decision before turning to the facts of the case before us.

**A**

In *Martin*, six individuals sued the City of Boise, Idaho, under 42 U.S.C. § 1983, alleging that the City had violated their Eighth Amendment rights in enforcing two ordinances that respectively barred, *inter alia*, (1) camping in public spaces and (2) sleeping in public places without permission. 920 F.3d at 603–04, 606. All six plaintiffs had been convicted of violating at least one of the ordinances, *id.* at 606, but we held that claims for retrospective relief based on those convictions were barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994). *See Martin*, 920 F.3d at 611–12 (noting that, under *Heck*, a § 1983 action may not be maintained if success in the suit would necessarily show the invalidity of the plaintiff's criminal conviction, unless that conviction has already been set aside or invalidated). What remained, after application of the *Heck* bar, were the claims for retrospective relief asserted by two plaintiffs (Robert Martin and Pamela Hawkes) in connection with citations they had received that did *not* result in convictions, and the claims for prospective injunctive and declaratory relief asserted by Martin and one additional plaintiff (Robert Anderson). *Id.* at 604, 610, 613–15; *see also id.* at 618–20 (Owens, J., dissenting in part) (dissenting from the majority's holding that the prospective relief claims survived *Heck*). On the merits of those three plaintiffs' Eighth Amendment claims, the *Martin* panel held that the district court had erred in granting summary judgment for the City. *Id.* at 615–18.

Although the text of the Eighth Amendment's Cruel and Unusual Punishments Clause states only that "cruel and unusual *punishments*" shall not be "inflicted," U.S. CONST., amend. VIII (emphasis added), the *Martin* panel nonetheless held that the Clause "places substantive limits" on the government's ability to *criminalize* "sitting, sleeping, or lying outside on public property," 920 F.3d at 615–16. In reaching this conclusion, the *Martin* panel placed dispositive reliance on the Supreme Court's decisions in *Robinson v. California*, 370 U.S. 660 (1962), and *Powell v. Texas*, 392 U.S. 514 (1968). I therefore briefly review those two decisions before returning to *Martin*.

*Robinson* held that a California law that made "it a criminal offense for a person to 'be addicted to the use of narcotics,'" 370 U.S. at 660 (quoting CAL. HEALTH & SAFETY CODE § 11721 (1957 ed.)), and that did so "even though [the person] has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment," *id.* at 667. The California statute, the Court emphasized, made the "'*status*' of narcotic addiction a criminal offense," regardless of whether the defendant had "ever *used or possessed* any narcotics within the State" or had "been guilty of any antisocial *behavior* there." *Id.* at 666 (emphasis added).

In *Powell*, a fractured Supreme Court rejected Powell's challenge to his conviction, under a Texas statute, for being "found in a state of intoxication in any public place." 392 U.S. at 517 (quoting TEX. PENAL CODE art. 477 (1952)). A four-Justice plurality distinguished *Robinson* on the ground that, because Powell "was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion," Texas had "not sought to punish a mere

status, as California did in *Robinson*." *Id*. at 532 (plurality). The plurality held that *Robinson* did not address, much less establish, that "certain *conduct* cannot constitutionally be punished because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.'" *Id*. at 533 (emphasis added).

Justice White concurred in the judgment on the narrower ground that Powell had failed to establish the "prerequisites to the possible invocation of the Eighth Amendment," which would have required him to "satisfactorily show[] that it was not feasible for him to have made arrangements to prevent his being in public when drunk and that his extreme drunkenness sufficiently deprived him of his faculties on the occasion in issue." *Id*. at 552 (White, J., concurring). And because, in Justice White's view, the Eighth Amendment at most provided a case-specific affirmative "defense" to application of the statute, *id*. at 552 n.4, he agreed that the Texas statute was "constitutional insofar as it authorizes a police officer to *arrest* any seriously intoxicated person when he is encountered in a public place," *id*. at 554 n.5 (emphasis added). Emphasizing that Powell himself "did not show that *his* conviction offended the Constitution" and that Powell had "made no showing that *he* was unable to stay off the streets on the night in question," Justice White concurred in the majority's affirmance of Powell's conviction. *Id.* at 554 (emphasis added).

The four dissenting Justices in *Powell* agreed that the Texas statute "differ[ed] from that in *Robinson*" inasmuch as it "covers more than a mere status." 392 U.S. at 567 (Fortas, J., dissenting). There was, as the dissenters noted, "no challenge here to the validity of public intoxication statutes in general or to the Texas public intoxication statute in particular." *Id*. at 558. Indeed, the dissenters agreed that, in the ordinary case "when the State proves such [public]

presence in a state of intoxication, this will be sufficient for conviction, and the punishment prescribed by the State may, of course, be validly imposed." *Id*. at 569. Instead, the dissenters concluded that the application of the statute to Powell was unconstitutional "*on the occasion in question*" in light of the Texas trial court's findings about Powell's inability to control his condition. *Id*. at 568 n.31 (emphasis added). Those findings concerning Powell's "constitutional defense," the dissenters concluded, established that Powell "was powerless to avoid drinking" and "that, once intoxicated, he could not prevent himself from appearing in public places." *Id*. at 558, 568; *see also id*. at 525 (plurality) (describing the elements of the "*constitutional defense*" that Powell sought to have the Court recognize).

While acknowledging that the plurality in *Powell* had "interpret[ed] *Robinson* as precluding only the criminalization of 'status,' not of 'involuntary' conduct," the *Martin* panel held that the controlling opinion was Justice White's concurrence. 920 F.3d at 616. As I have noted, Justice White concluded that the Texas statute against public drunkenness could constitutionally be applied, even to an alcoholic, if the defendant failed to "satisfactorily show[] that it was not feasible for him to have made arrangements to prevent his being in public when drunk and that his extreme drunkenness sufficiently deprived him of his faculties on the occasion in issue." *Powell*, 392 U.S. at 552 (White, J., concurring).[2] Under *Marks v. United States*,

---

[2] Justice White, however, did not resolve the further question of whether, if such a showing *had* been made, the Eighth Amendment would have been violated. He stated that the Eighth Amendment "*might* bar conviction" in such circumstances, but he found it "unnecessary" to decide whether that "novel construction of that Amendment" was ultimately correct. 392 U.S. at 552–53 & n.4 (emphasis added).

430 U.S. 188 (1977), this narrower reasoning given by Justice White for joining the *Powell* majority's judgment *upholding* the conviction constitutes the Court's holding in that case. *See id*. at 193 ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (citation omitted)); *see also United States v. Moore*, 486 F.2d 1139, 1151 (D.C. Cir. 1973) (en banc) (Wilkey, J., concurring) (concluding that the judgment in *Powell* rested on the overlap in the views of "four members of the Court" who held that Powell's acts of public drunkenness "were punishable without question" and the view of Justice White that Powell's acts "were punishable so long as the acts had not been proved to be the product of an established irresistible compulsion").

The *Martin* panel quoted dicta in Justice White's concurrence suggesting that, if the defendant could make the requisite "showing" that "resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible," then the Texas statute "[a]s applied" to such persons might violate "the Eighth Amendment." 920 F.3d at 616 (quoting *Powell*, 392 U.S. at 551 (White, J., concurring)). These dicta, *Martin* noted, overlapped with similar statements in the dissenting opinion in *Powell*, and from those two opinions, the *Martin* panel derived the proposition that "five Justices" had endorsed the view that "the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Id*. (citation omitted). Applying that principle, *Martin* held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for

homeless individuals who cannot obtain shelter." *Id*. Because "human beings are biologically compelled to rest, whether by sitting, lying, or sleeping," *Martin* held that prohibitions on such activities in public cannot be applied to those who simply have "no option of sleeping indoors." *Id*. at 617.

The *Martin* panel emphasized that its "holding is a narrow one." *Id*. *Martin* recognized that, if there are sufficient available shelter beds for all homeless persons within a jurisdiction, then of course there can be no Eighth Amendment impediment to enforcing laws against sleeping and camping in public, because those persons engaging in such activities cannot be said to have "no option of sleeping indoors." *Id*. But "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for *involuntarily* sitting, lying, and sleeping in public." *Id*. (simplified) (emphasis added). Consistent with Justice White's concurrence, the *Martin* panel emphasized that, in determining whether the defendant was being punished for conduct that was "involuntary and inseparable from status," *id*. (citation omitted), the specific individual circumstances of the defendant must be considered. Thus, *Martin* explained, the panel's "holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Id*. at 617 n.8. But *Martin* held that, where it is shown that homeless persons "do not have a single place where they can lawfully be," an ordinance against sleeping or camping in public, "as applied to them, effectively punish[es] them for something for which they may not be convicted under the Eighth Amendment." *Id*. at 617 (simplified). Concluding that the remaining

plaintiffs had "demonstrated a genuine issue of material fact" as to their lack of any access to indoor shelter, *Martin* reversed the district court's grant of summary judgment to the City. *Id.* at 617 n.9; *see also id.* at 617–18.

## B

With that backdrop in place, I turn to the specific facts of this case.

In the operative Third Amended Complaint, named Plaintiffs Debra Blake, Gloria Johnson, and John Logan sought to represent a putative class of "all involuntarily homeless people living in Grants Pass, Oregon" in pursuing a variety of claims under 42 U.S.C. § 1983 against the City of Grants Pass. In particular, they asserted that the following three sections of the Grants Pass Municipal Code ("GPMC"), which generally prohibited sleeping and camping in public, violated the Eighth Amendment's Cruel and Unusual Punishments Clause and its Excessive Fines Clause:

### 5.61.020 Sleeping on Sidewalks, Streets, Alleys, or Within Doorways Prohibited

A. No person may sleep on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety.

B. No person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk.

C. In addition to any other remedy provided by law, any person found in

violation of this section may be immediately removed from the premises.

### 5.61.030 Camping Prohibited

No person may occupy a campsite in or upon any sidewalk, street, alley, lane, public right of way, park, bench, or any other publicly-owned property or under any bridge or viaduct, [subject to specified exceptions].[3]

### 6.46.090 Camping in Parks

A. It is unlawful for any person to camp, as defined in GPMC Title 5, within the boundaries of the City parks.

B. Overnight parking of vehicles shall be unlawful. For the purposes of this section, anyone who parks or leaves a vehicle parked for two consecutive hours or who remains within one of the parks as herein defined for purposes of camping as defined in this section for two consecutive hours, without permission from the City Council, between the hours of midnight and 6:00 a.m. shall be considered in violation of this Chapter.

---

[3] The definition of "campsite" for purposes of GPMC 5.61.030 includes using a "vehicle" as a temporary place to live. *See* GPMC 5.61.010(B).

Plaintiffs' complaint also challenged the following "park exclusion" ordinance as a violation of their "Eighth and Fourteenth Amendment rights":

### 6.46.350 Temporary Exclusion from City Park Properties

An individual may be issued a written exclusion order by a police officer of the Public Safety Department barring said individual from all City Park properties for a period of 30 days, if within a one-year period the individual:

A. Is issued 2 or more citations for violating regulations related to City park properties, or

B. Is issued one or more citations for violating any state law(s) while on City park property.[4]

---

[4] This latter ordinance was amended in September 2020 to read as follows:

An individual may be issued a written exclusion order by a police officer of the Public Safety Department barring said individual from a City park for a period of 30 days, if within a one-year period the individual:

A. Is issued two or more citations in the same City park for violating regulations related to City park properties, or

In an August 2019 order, the district court certified a class seeking declaratory and injunctive relief with respect to Plaintiffs' Eighth Amendment claims, pursuant to Federal Rule of Civil Procedure 23(b)(2).[5] As defined in the court's order, the class consists of "[a]ll involuntarily homeless individuals living in Grants Pass, Oregon, including homeless individuals who sometimes sleep outside city limits to avoid harassment and punishment by Defendant as addressed in this lawsuit."

After the parties filed cross-motions for summary judgment, the district court in July 2020 granted Plaintiffs' motion in relevant part and denied the City's motion. The district court held that, under *Martin*, the City's enforcement of the above-described ordinances violated the Cruel and Unusual Punishments Clause. The court further held that, for similar reasons, the ordinances imposed excessive fines in violation of the Eighth Amendment's Excessive Fines Clause.

After Plaintiffs voluntarily dismissed those claims as to which summary judgment had been denied to both sides, the district court entered final judgment declaring that the City's enforcement of the anti-camping and anti-sleeping

---

B. Is issued one or more citations for violating any state law(s) while on City park property.

The foregoing exclusion order shall only apply to the particular City park in which the offending conduct under 6.46.350(A) or 6.46.350(B) occurred.

[5] At the time that the district court certified the class, the operative complaint was the Second Amended Complaint. That complaint was materially comparable to the Third Amended Complaint, with the exception that it did not mention the park-exclusion ordinance or seek injunctive relief with respect to it.

ordinances (GPMC §§ 5.61.020, 5.61.030, 6.46.090) violates "the Eighth Amendment prohibition against cruel and unusual punishment" and its "prohibition against excessive fines." Nonetheless, the court's final injunctive relief did not prohibit all enforcement of these provisions. Enforcement of § 5.61.020 (the anti-sleeping ordinance) was not enjoined at all. The City was enjoined from enforcing the anti-camping ordinances (GPMC §§ 6.46.030 and 6.46.090) "without first giving a person a warning of at least 24 hours before enforcement." It was further enjoined from enforcing those ordinances, and a related ordinance against criminal trespass on city property, in all but one City park during specified evening and overnight hours, which varied depending upon the time of year. Finally, the City was enjoined from enforcing the park-exclusion ordinance.[6]

The City timely appealed from that judgment and from the district court's subsequent award of attorneys' fees.

**II**

Before turning to the merits, I first address the question of our jurisdiction under Article III of the Constitution. *Plains Com. Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008) (holding that courts "bear an

---

[6] The district court's summary judgment order and judgment also declared that a separate ordinance (GPMC § 6.46.355), which addressed the procedures for appealing park-exclusion orders under § 6.46.350, failed to provide sufficient procedural due process. The parties dispute whether this claim was adequately raised and reached below, but as the majority notes, this claim for purely prospective relief has been mooted by the City's subsequent amendment of § 6.46.355 in a way that removes the features that had led to its invalidation. *See* Opin. at 48. Accordingly, this aspect of the district court's judgment should be vacated and remanded with instructions to dismiss as moot Plaintiffs' challenge to § 6.46.355.

independent obligation to assure [them]selves that jurisdiction is proper before proceeding to the merits").

"In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). "The doctrine of standing is one of several doctrines that reflect this fundamental limitation," and in the context of a request for prospective injunctive or declaratory relief, that doctrine requires a plaintiff to "show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id.* at 493. The requirement to show an actual threat of *imminent* injury-in-fact in order to obtain prospective relief is a demanding one: the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S 398, 409 (2013) (simplified).

As "an indispensable part of the plaintiff's case," each of these elements of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because, as in *Lujan*, this case arises from a grant of summary judgment, the question is whether, in seeking

summary judgment, Plaintiffs "'set forth' by affidavit or other evidence 'specific facts'" in support of each element of standing. *Id*. (citation omitted). Moreover, "standing is not dispensed in gross," and therefore "a plaintiff must demonstrate standing for *each* claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006) (emphasis added) (citation omitted).

Plaintiffs' operative complaint named three individual plaintiffs as class representatives (John Logan, Gloria Johnson, and Debra Blake), and we have jurisdiction to address the merits of a particular claim if any one of them sufficiently established Article III standing as to that claim. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."); *see also Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements."). Accordingly, I address the showing made by each named Plaintiff in support of summary judgment.

In my view, Plaintiff John Logan failed to establish that he has standing to challenge any of the ordinances in question. In support of his motion for summary judgment, Logan submitted a half-page declaration stating, in conclusory fashion, that he is "involuntarily homeless in Grants Pass," but that he is "sleeping in [his] truck at night at a rest stop North of Grants Pass." He asserted that he "cannot sleep in the City of Grants Pass for fear that [he] will be awakened, ticketed, fined, moved along, trespassed[,] and charged with Criminal Trespass." Logan also previously submitted two declarations in support of his class certification motion. In them, Logan stated that he has been

homeless in Grants Pass for nearly seven of the last 10 years; that there have been occasions in the past in which police in Grants Pass have awakened him in his car and instructed him to move on; and that he now generally sleeps in his truck outside of Grants Pass.  Logan has made no showing that, over the seven years that he has been homeless, he has ever been issued a citation for violating the challenged ordinances, nor has he provided any facts to establish either that the threat of such a citation is "certainly impending" or that "there is a substantial risk" that he may be issued a citation.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted).  At best, his declarations suggest that he would *prefer* to sleep in his truck within the City limits rather than outside them, and that he is subjectively deterred from doing so due to the City's ordinances.  But such "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).  Nor has Logan provided any facts that would show that he has any actual intention or plans to stay overnight in the City.  *See Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) ("[W]e have concluded that pre-enforcement plaintiffs who failed to allege a concrete intent to violate the challenged law could not establish a credible threat of enforcement.").  Even if his declarations could be generously construed as asserting an intention to stay in the City at some future point, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Court's] cases require."  *Lujan*, 504 U.S. at 564; *cf. Driehaus*, 573 U.S. at 161 (permitting pre-enforcement challenge against ordinance regulating election-related speech where plaintiffs' allegations identified "specific statements they intend[ed] to make in

future election cycles"). And, contrary to what the majority suggests, *see* Opin. at 24 n.16, Logan's vaguely described knowledge about what has happened to *other* people cannot establish his standing. Accordingly, Logan failed to carry his burden to establish standing for the prospective relief he seeks.

By contrast, Plaintiff Gloria Johnson made a sufficient showing that she has standing to challenge the general anti-camping ordinance, GPMC § 5.61.030, and the parks anti-camping ordinance, GPMC § 6.46.090. Although Johnson's earlier declaration in support of class certification stated that she "often" sleeps in her van outside the City limits, she also stated that she "*continue[s]* to live without shelter in Grants Pass" and that, consequently, "[a]t any time, I could be arrested, ticketed, fined, and prosecuted for sleeping outside in my van or for covering myself with a blanket to stay warm" (emphasis added). Her declaration also recounts "dozens of occasions" in which the anti-camping ordinances have been enforced against her, either by instructions to "move along" or, in one instance, by issuance of a citation for violating the parks anti-camping ordinance, GPMC § 6.46.090. Because Johnson presented facts showing that she continues to violate the anti-camping ordinances and that, in light of past enforcement, she faces a credible threat of future enforcement, she has standing to challenge those ordinances. *Lujan*, 504 U.S. at 564. Johnson, however, presented no facts that would establish standing to challenge either the anti-sleeping ordinance (which, unlike the anti-camping ordinances, does not apply to sleeping in a vehicle),

the park-exclusion ordinance, or the criminal trespass ordinance.[7]

Debra Blake sufficiently established her standing, both in connection with the class certification motion and the summary judgment motion.  Although she was actually living in temporary housing at the time she submitted her declarations in support of class certification in March and June 2019, she explained that that temporary housing would soon expire; that she would become homeless in Grants Pass again; and that she would therefore again be subject to being "arrested, ticketed and prosecuted for sleeping outside or for covering myself with a blanket to stay warm."  And, as her

---

[7] The majority concludes that Johnson's standing to challenge the anti-camping ordinances necessarily establishes her standing to challenge the park-exclusion and criminal-trespass ordinances.  *See* Opin. at 24 n.15.  But as the district court explained, the undisputed evidence concerning Grants Pass's enforcement policies established that "Grants Pass first issues fines for violations and *then* either issues a trespass order or excludes persons from all parks *before* a person is charged with misdemeanor criminal trespass" (emphasis added).  Although Johnson's continued intention to sleep in her vehicle in Grants Pass gives her standing to challenge the anti-camping ordinances, Johnson has wholly failed to plead any facts to show, *inter alia*, that she intends to engage in the *further* conduct that might expose her to a "credible threat" of prosecution under the park-exclusion or criminal trespass ordinances.  *Driehaus*, 573 U.S. at 159 (citation omitted).  Johnson's declaration states that she has been homeless in Grants Pass for three years, but it does not contend that she has ever been issued, or threatened with issuance of, a trespass order, a park-exclusion order, or a criminal trespass charge or that she has "an intention to engage in a course of conduct" that would lead to such an order or charge.  *Id.* (citation omitted).  Because "standing is not dispensed in gross," *see DaimlerChrysler*, 547 U.S. at 353 (citation omitted), Johnson must separately establish her standing with respect to each ordinance, and she has failed to do so with respect to the park-exclusion and criminal-trespass ordinances.

declaration at summary judgment showed, that is exactly what happened: in September 2019, she was cited for sleeping in the park in violation of GPMC § 6.46.090, convicted, and fined.  Her declarations also confirmed that Blake's persistence in sleeping and camping in a variety of places in Grants Pass had also resulted in a park-exclusion order (which she successfully appealed), and in citations for violation of the anti-sleeping ordinance, GPMC § 5.61.020 (for sleeping in an alley), and for criminal trespass on City property.  Based on this showing, I conclude that Blake established standing to challenge each of the ordinances at issue in the district court's judgment.

However, Blake subsequently passed away during this litigation, as her counsel noted in a letter to this court submitted under Federal Rule of Appellate Procedure 43(a). Because the only relief she sought was prospective declaratory and injunctive relief, Blake's death moots her claims.  *King v. County of Los Angeles*, 885 F.3d 548, 553, 559 (9th Cir. 2018).  And because, as explained earlier, Blake was the only named Plaintiff who established standing with respect to the anti-sleeping, park-exclusion, and criminal trespass ordinances that are the subject of the district court's classwide judgment, her death raises the question whether we consequently lack jurisdiction over those additional claims.  Under *Sosna v. Iowa*, 419 U.S. 393 (1975), the answer to that question would appear to be no. Blake established her standing at the time that the class was certified and, as a result, "[w]hen the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [Blake]."  *Id*. at 399. "Although the controversy is no longer alive as to [Blake], it remains very much alive for the class of persons she [had] been certified to represent."  *Id*. at 401; *see also Nielsen v.*

*Preap*, 139 S. Ct. 954, 963 (2019) (finding no mootness where "there was at least one named plaintiff with a live claim when the class was certified"); *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 987–88 (9th Cir. 2007) (en banc).

There is, however, presently no class representative who meets the requirements for representing the certified class with respect to the anti-sleeping, park-exclusion, and criminal trespass ordinances.[8] Although that would normally require a remand to permit the possible substitution of a new class member, *see Kuahulu v. Employers Ins. of Wausau*, 557 F.2d 1334, 1336–37 (9th Cir. 1977), I see no need to do so here, and that remains true even if one assumes that the failure to substitute a new class representative might otherwise present a potential jurisdictional defect. As noted earlier, we have jurisdiction to address all claims concerning the two anti-camping ordinances, as to which Johnson has

---

[8] Because—in contrast to the named representative in *Sosna*, who had Article III standing at the time of certification—Johnson and Logan *never* had standing to represent the class with respect to the anti-sleeping ordinance, they may not represent the class as to such claims. *See Sosna*, 419 U.S. at 403 (holding that a *previously proper* class representative whose claims had become moot on appeal could continue to represent the class for purposes of that appeal); *see also Bates*, 511 F.3d at 987 (emphasizing that the named plaintiff "had standing at the time of certification"); *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 966 (9th Cir. 2019) (stating that "class representatives must have Article III standing"); *cf. NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. SW., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019) (holding that, where the named plaintiffs never had standing, the class "must be decertified"). The majority correctly concedes this point. *See* Opin. at 25–26. Nonetheless, the majority wrongly allows Johnson and Logan to represent the class as to the park-exclusion and criminal-trespass ordinances, based on its erroneous conclusion that they established standing to challenge those ordinances. *See supra* at 63–66 & n.7.

sufficient standing to represent the certified class. And, as I shall explain, the class as to those claims should be decertified, and the reasons for that decertification rest on cross-cutting grounds that apply equally to all claims. As a result, I conclude that we have jurisdiction to order the complete decertification of the class as to all claims, without the need for a remand to substitute a new class representative as to the anti-sleeping, park-exclusion, and criminal trespass ordinances. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998) (holding that, where "a merits issue [is] dispositively resolved in a companion case," that merits ruling could be applied to the other companion case without the need for a remand to resolve a potential jurisdictional issue).

## III

I therefore turn to whether the district court properly certified the class under Rule 23 of the Federal Rules of Civil Procedure. In my view, the district court relied on erroneous legal premises in certifying the class, and it therefore abused its discretion in doing so. *B.K.*, 922 F.3d at 965.

## A

"To obtain certification of a plaintiff class under Federal Rule of Civil Procedure 23, a plaintiff must satisfy both the four requirements of Rule 23(a)—'numerosity, commonality, typicality, and adequate representation'—and 'one of the three requirements listed in Rule 23(b).'" *A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 834 (9th Cir. 2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 349 (2011)). Commonality, which is contested here, requires a showing that the class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which

means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. In finding that commonality was satisfied with respect to the Eighth Amendment claims, the district court relied solely on the premise that whether the City's conduct "violates the Eighth Amendment" was a common question that could be resolved on a classwide basis. And in finding that Rule 23(b) was satisfied here, the district court relied solely on Rule 23(b)(2), which provides that a "class action may be maintained" if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). That requirement was satisfied, the district court concluded, because (for reasons similar to those that underlay its commonality analysis) the City's challenged enforcement of the ordinances "applies equally to all class members." The district court's commonality and Rule 23(b)(2) analyses are both flawed because they are based on an incorrect understanding of our decision in *Martin*.

As the earlier discussion of *Martin* makes clear, the Eighth Amendment theory adopted in that case requires an individualized inquiry in order to assess whether any individuals to whom the challenged ordinances are being applied "*do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." 920 F.3d at 617 n.8. *See supra* at 55–57. Only when persons "do not have a *single place* where they can lawfully be," can it be said that an ordinance against sleeping or camping in public, "*as applied to them*, effectively punish[es] them for something for which they may not be

convicted under the Eighth Amendment." *Id*. at 617 (simplified) (emphasis added).

Of course, such an individualized inquiry is not required—and no Eighth Amendment violation occurs under *Martin*—when the defendant can show that there is adequate shelter space to house all homeless persons in the jurisdiction. *Id*. But the converse is not true—the mere fact that a city's shelters are full does *not* by itself establish, without more, that any particular person who is sleeping in public does "not have a single place where [he or she] can lawfully be." *Id*. The logic of *Martin*, and of the opinions in *Powell* on which it is based, requires an assessment of a person's individual situation before it can be said that the Eighth Amendment would be violated by applying a particular provision against that person. Indeed, the opinions in *Powell* on which *Martin* relied—Justice White's concurring opinion and the opinion of the dissenting Justices—all agreed that, at most, the Eighth Amendment provided a case-specific affirmative defense that would require the defendant to provide a "satisfactor[y] showing that it was not feasible for him to have made arrangements" to avoid the conduct at issue. *Powell*, 392 U.S. at 552 (White, J., concurring); *id*. at 568 n.31 (Fortas, J., dissenting) (agreeing with Justice White that the issue is whether the defendant "on the occasion in question" had shown that avoiding the conduct was "impossible"); *see also supra* at 53.[9]

---

[9] The majority incorrectly contends that the dissenters in *Powell* did not endorse Justice White's conclusion that the *defendant* bears the burden to establish that his or her conduct was involuntary. *See* Opin. at 42–45. On the contrary, the *Powell* dissenters' entire argument rested on the affirmative "constitutional defense" presented at the trial in that

In light of this understanding of *Martin*, the district court clearly erred in finding that the requirement of commonality was met here. "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350 (simplified). Under *Martin*, the answer to the question whether the City's enforcement of each of the anti-camping ordinances violates the Eighth Amendment turns on the individual circumstances of each person to whom the ordinance is being applied on a given occasion. That question is simply not one that can be resolved, on a common basis, "in one stroke." *Id*. That requires decertification.

For similar reasons, the district court also erred in concluding that the requirements of Rule 23(b)(2) were met. By its terms, Rule 23(b)(2) is satisfied only if (1) the

---

case and on the findings made by the trial court in connection with that defense. *See* 392 U.S. at 558 (Fortas, J., dissenting). The majority's suggestion that I have taken that explicit reference to Powell's defense "out of context," *see* Opin. at 42 n.29, is demonstrably wrong—the context of the case was precisely the extensive affirmative defense that Powell presented at trial, including the testimony of an expert. *See id*. at 517–26 (plurality) (summarizing the testimony). And, of course, in *Martin*, the issue was raised in the context of a § 1983 action in which the plaintiffs challenging the laws bore the burden to prove the involuntariness of their relevant conduct. The majority points to nothing that would plausibly support the view that *Powell* and *Martin* might require the *government* to carry the burden to establish *voluntariness*. *See* Opin. at 44 n.31 (leaving this issue open). The majority claims that it can sidestep this issue here, but that is also wrong: the burden issue is critical both to the class-certification analysis and to the issue of summary judgment on the merits. *See infra* at 72–82.

defendant has acted (or refused to act) on grounds that are generally applicable to the class as whole and (2) as a result, final classwide or injunctive relief is appropriate.  As the Supreme Court has observed, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Wal-Mart*, 564 U.S. at 360.  It follows that, when the *wrongfulness* of the challenged conduct with respect to any particular class member depends critically upon the individual circumstances of that class member, a class action under Rule 23(b)(2) is not appropriate.  In such a case, in which (for example) the challenged enforcement of a particular law may be lawful as to some persons and not as to others, depending upon their individual circumstances, the all-or-nothing determination of wrongfulness that is the foundation of a (b)(2) class is absent: in such a case, it is simply not true that the defendant's "conduct is such that it can be enjoined or declared unlawful *only* as to *all* of the class members or as to *none* of them.'"  *Id.* (emphasis added).

Because *Martin* requires an assessment of each person's individual circumstances in order to determine whether application of the challenged ordinances violates the Eighth Amendment, these standards for the application of Rule 23(b)(2) were plainly not met in this case.  That is, because the applicable law governing Plaintiffs' claims would entail "a process through which highly individualized determinations of liability and remedy are made," certification of a class under Rule 23(b)(2) is improper. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012).  Moreover, the mere fact that the district court's final judgment imposes sweeping across-the-board injunctive relief that disregards individual differences in determining

the defendant's liability does *not* mean that Rule 23(b)(2) has been satisfied.  The rule requires that any such classwide relief be rooted in a determination of *classwide liability*— the defendant must have acted, or be acting, unlawfully "on grounds that apply generally to the class, *so that* final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2) (emphasis added).  That requirement was not established here, and the class must be decertified.[10]

## B

The majority provides two responses to this analysis, but both of them are wrong.

First, the majority contends that *Martin* established a bright-line rule that "the government cannot prosecute homeless people for sleeping in public"—or, presumably, for camping—"if there 'is a greater number of homeless individuals in [a jurisdiction] than the number of available' shelter spaces."  *See* Opin. at 13 (quoting *Martin*, 920 F.3d at 617).  Because, according to the majority, *Martin* establishes a simple "formula" for determining when all enforcement of anti-camping and anti-sleeping ordinances

---

[10] The majority wrongly concludes that the City has forfeited any argument concerning Rule 23(b)(2) because it did not specifically mention that subdivision of the rule in its opening brief.  Opin. at 34. This "Simon Says" approach to reading briefs is wrong.  The *substance* of the argument is contained in the opening brief, in which the City explicitly contended that *Martin* requires "a more individualized analysis" than the district court applied and that, as a result, "neither FED. R. CIV. P. 23 nor *Martin* provide plaintiffs the ability to establish the type of sweeping class-wide claims advanced in this case."  Indeed, Plaintiffs themselves responded to this argument, in their answering brief, by explaining why they believe that the requirements of Rule 23(b)(2) were met.

must cease, it presents a common question that may be resolved on a classwide basis. *See* Opin. at 13; *see also* Opin. at 28–29, 31. As the above analysis makes clear, the majority's premise is incorrect. *Martin* states that, if there are insufficient available beds at shelters, then a jurisdiction "cannot prosecute homeless individuals for '*involuntarily* sitting, lying, and sleeping in public.'" 920 F.3d at 617 (emphasis added). The lack of adequate shelter beds thus merely eliminates a *safe-harbor* that might otherwise have allowed a jurisdiction to prosecute violations of such ordinances *without* regard to individual circumstances, with the result that the jurisdiction's enforcement power will instead depend upon whether the conduct of the individual on a particular occasion was "involuntar[y]." *Id*. *Martin* confirms that the resulting inquiry turns on whether the persons in question "*do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Id*. at 617 n.8; *see also id*. at 617 (stating that enforcement is barred only if the persons in question "do not have a single place where they can lawfully be" (citation omitted)). And the majority's misreading of *Martin* completely disregards the *Powell* opinions on which *Martin* relied, which make unmistakably clear that an individualized showing of involuntariness is required.

Second, the majority states that, to the extent that *Martin* requires such an individualized showing to establish an Eighth Amendment violation, any such individualized issue here has been eliminated by the fact that "[p]ursuant to the class definition, the class includes only *involuntarily* homeless persons." *See* Opin. at 31–33. As the majority acknowledges, "[p]ersons are involuntarily homeless" under *Martin* only "if they do not 'have access to adequate temporary shelter,'" such as, for example, when they lack

"'the means to pay for it'" and it is otherwise not "'realistically available to them for free.'"  Opin. at 8 n.2 (quoting *Martin*, 920 F.3d at 617 n.8).  Because that individualized issue has been shifted into the class definition, the majority holds, the City's enforcement of the challenged ordinances against *that* class can in that sense be understood to present a "common question" that can be resolved in one stroke.  According to the majority, because the class definition requires that, at the time the ordinances are applied against them, the class members must be "involuntarily homeless" in the sense that *Martin* requires, there is a common question as to whether "the City's enforcement of the anti-camping ordinances against all involuntarily homeless individuals violates the Eighth Amendment."  *See* Opin. at 31–33 & n.22.

The majority cites no authority for this audacious bootstrap argument.  If a person's individual circumstances are such that he or she has *no* "access to adequate temporary shelter"—which necessarily subsumes (among other things) the determination that there are no shelter beds available— then the *entire* (highly individualized) question of the City's liability to that person under *Martin*'s standards has been shifted into the class definition.  That is wholly improper.  *See Olean Wholesale Grocery Coop. v. Bumble Bee Foods*, 31 F.4th 651, 670 n.14 (9th Cir. 2022) (en banc) ("A court may not . . . create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct."); *see also Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016) (stating that it would be improper to define a class in such a way "as to preclude membership unless the liability of the defendant is established" (simplified)).

The majority nonetheless insists that "[m]embership in the class" here "has no connection to the success of the underlying claims." *See* Opin. at 32 n.23. That is obviously false. As I have explained, *Martin*'s understanding of when a person "involuntarily" lacks "access to adequate temporary shelter" or to "a single place where [he or she] can lawfully be," *see* 920 F.3d at 617 & n.8 (citations omitted), requires an individualized inquiry into a given person's circumstances at a particular moment. By insisting that a common question exists here *because Martin*'s involuntariness standard has been folded into the class definition, the majority is unavoidably relying on a fail-safe class definition that improperly subsumes this crucial individualized merits issue into the class definition. The majority's artifice renders the limitations of Rule 23 largely illusory.[11]

To the extent that the majority instead suggests that the class definition requires only an involuntary lack of access to regular or permanent shelter to qualify as "involuntarily

---

[11] The majority contends that, despite the presence of a liability-determining individualized issue in the class definition, there is no fail-safe class here because one or more of the claims might still conceivably fail on the merits for *other* reasons. *See* Opin. at 32 n.23. But the majority does not identify any such other reasons and, of course, under the majority's view of the substantive law, there are none. But more importantly, the majority is simply wrong in positing that the *only* type of class that would qualify as an impermissible fail-safe class is one in which *every* conceivable merits issue in the litigation has been folded into the class definition. What matters is whether the class definition folds within it *any* bootstrapping merits issue (such as the "injur[y]" issue mentioned in *Olean*) as to which "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Olean*, 31 F.4th at 670 n.14. To the extent that the central individualized merits issue in this case has been folded into the class definition, that defect is present here.

homeless," its argument collapses for a different reason. Because *Martin*'s Eighth Amendment holding applies only to those who involuntarily lack "access to adequate temporary shelter" on a given occasion, *see* 920 F.3d at 617 n.8, such an understanding of the class definition would *not* be sufficient to eliminate the highly individualized inquiry into whether a particular person lacked such access at a given moment, and the class would then have to be decertified for the reasons I have discussed earlier. *See supra* at 69–74. Put simply, the majority cannot have it both ways: either the class definition is co-extensive with *Martin*'s involuntariness concept (in which case the class is an improper fail-safe class) or the class definition differs from the *Martin* standard (in which case *Martin*'s individualized inquiry requires decertification).

## IV

Given these conclusions as to standing and class certification, all that remains are the individual claims of Johnson for prospective relief against enforcement of the two anti-camping ordinances. In my view, these claims fail as a matter of law.

Johnson's sole basis for challenging these ordinances is that they prohibit her from sleeping in her van within the City. In her declaration in support of class certification, however, Johnson specifically stated that she has "often" been able to sleep in her van by parking *outside* the City limits. In a supplemental declaration in support of summary judgment, she affirmed that these facts "remain true," but she added that there had also been occasions in which, outside the City limits, county officers had told her to "move on" when she "was parked on county roads" and that, when she parked "on BLM land"—*i.e.*, land managed by the

federal Bureau of Land Management—she was told that she "could only stay on BLM for a few days."

As an initial matter, Johnson's declaration provides no non-conclusory basis for finding that she lacks *any* option other than sleeping in her van. Although her declaration notes that she worked as a nurse "for decades" and that she now collects social security benefits, the declaration simply states, without saying anything further about her present economic situation, that she "cannot afford housing." Her declaration also says nothing about where she lived before she began living "on the street" a few years ago, and it says nothing about whether she has any friends or family, in Grants Pass or elsewhere, who might be able to provide assistance.[12] And even assuming that this factual showing would be sufficient to permit a trier of fact to find that Johnson lacks any realistic option other than sleeping in her van, we cannot affirm the district court's summary judgment in Johnson's favor without holding that her showing was so overwhelming that she should prevail as a matter of law. Because a reasonable trier of fact could find, in light of these evidentiary gaps, that Johnson failed to carry her burden of

---

[12] The majority dismisses these questions about the sufficiency of Johnson's evidentiary showing as "artificial limitations" on claims under *Martin*, *see* Opin. at 44, but the standard for establishing an Eighth Amendment violation under *Martin* and the *Powell* opinions on which it relies is a demanding and individualized one, and we are obligated to follow it. Indeed, in upholding Powell's conviction for public drunkenness, the controlling opinion of Justice White probed the details of the record as to whether, in light of the fact that Powell "had a home and wife," he could have "made plans while sober to prevent ending up in a public place," and whether, despite his chronic alcoholism, he "retained the power to stay off or leave the streets, and simply preferred to be there rather than elsewhere." 392 U.S. at 553.

proof on this preliminary point, summary judgment in her favor was improper.[13]

But even assuming that Johnson had established that she truly has no option other than sleeping in her van, her showing is still insufficient to establish an Eighth Amendment violation.  As noted, Johnson's *sole* complaint in this case is that, by enforcing the anti-camping ordinances, the City will not let her sleep in her van.  But the sparse facts she has presented fail to establish that she lacks any alternative place where she could park her van and sleep in it.  On the contrary, her factual showing establishes that the BLM will let her do so on BLM land for a "few days" at a time and that she also has "often" been able to do so on county land.   Given that Johnson has failed to present sufficient evidence to show that she lacks alternatives that would allow her to avoid violating the City's anti-camping ordinances, she has not established that the conduct for which the City would punish her is involuntary such that, under *Martin* and the *Powell* opinions on which *Martin* relies, it would violate the Eighth Amendment to enforce that prohibition against her.

---

[13] The majority errs by instead counting all gaps in the evidentiary record against the City, faulting it for what the majority thinks the City has failed to "demonstrate[]," *See* Opin. at 45 & n.32.  That is contrary to well-settled law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that a movant's summary judgment motion should be granted "against a [nonmovant] who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").   The majority's analysis also belies its implausible claim that it has not shifted the burden to the City to establish the *voluntariness* of the behavior targeted by the ordinances.  *See supra* at 71 n.9.

In nonetheless finding that the anti-camping ordinances' prohibition on sleeping in vehicles violates the Eighth Amendment, the majority apparently relies on the premise that the question of whether an individual has options for avoiding violations of the challenged law must be limited to alternatives that are *within the City limits*. Under this view, if a large homeless shelter with 1,000 vacant beds were opened a block outside the City's limits, the City would *still* be required by the Eighth Amendment to allow hundreds of people to sleep in their vans in the City and, presumably, in the City's public parks as well. Nothing in law or logic supports such a conclusion. *Martin* says that anti-sleeping ordinances may be enforced, consistent with the Eighth Amendment, so long as there is a "*single place* where [the person] can lawfully be," 920 F.2d at 617 (emphasis added) (citation omitted), and Justice White's concurrence in *Powell* confirms that the Eighth Amendment does not bar enforcement of a law when the defendant has failed to show that avoiding the violative conduct is "*impossible*," 392 U.S. at 551 (emphasis added).[14] Nothing in the rationale of this Eighth Amendment theory suggests that the inquiry into whether it is "impossible" for the defendant to avoid violating the law must be artificially constrained to only those particular options that suit the defendant's geographic or other preferences. To be sure, Johnson states that having to drive outside the City limits costs her money for gas, but that does not provide any basis for concluding that the option is infeasible or that she has thereby suffered "cruel and unusual punishment."

---

[14] The majority complains that this standard is too high, *see* Opin. at 45, but it is the standard applied in *Martin* and in the *Powell* opinions on which *Martin* relied.

Finally, because the district court's reliance on the Excessive Fines Clause was predicated on the comparable view that the challenged ordinances punish "status and not conduct" in violation of *Robinson*, that ruling was flawed for the same reasons. And because Johnson provides no other basis for finding an Excessive Fines violation here, her claims under that clause also fail as a matter of law.

## V

Accordingly, I would remand this case with instructions (1) to dismiss as moot the claims of Debra Blake as well as Plaintiffs' claims with respect to GPMC § 6.46.355; (2) to dismiss the claims of John Logan for lack of Article III standing; (3) to dismiss the remaining claims of Gloria Johnson for lack of Article III standing, except to the extent that she challenges the two anti-camping ordinances (GPMC §§ 5.61.030, 6.46.090); (4) to decertify the class; and (5) to grant summary judgment to the City, and against Johnson, with respect to her challenges to the City's anti-camping ordinances under the Eighth Amendment's Cruel and Unusual Punishments Clause and Excessive Fines Clause. That disposes of all claims at issue, and I therefore need not reach any of the many additional issues discussed and decided by the majority's opinion or raised by the parties.[15]

---

[15] Two of the majority's expansions of *Martin* nonetheless warrant special mention. First, the majority's decision goes well beyond *Martin* by holding that the Eighth Amendment precludes enforcement of anti-camping ordinances against those who involuntarily lack access to temporary shelter, if those ordinances deny such persons the use of whatever materials they need "to keep themselves warm and dry." *See* Opin. at 39. It seems unavoidable that this newly declared right to the necessary "materials to keep warm and dry" while sleeping in public parks must include the right to use (at least) a tent; it is hard to see how

## VI

Up to this point, I have faithfully adhered to *Martin* and its understanding of *Powell*, as I am obligated to do.  *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc).  But given the importance of the issues at stake, and the gravity of *Martin*'s errors, I think it appropriate to conclude by noting my general agreement with many of the points made by my colleagues who dissented from our failure to rehear *Martin* en banc.

In particular, I agree that, by combining *dicta* in a concurring opinion with a *dissent*, the panel in *Martin* plainly misapplied *Marks*' rule that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken *by those Members who concurred in the judgments* on the narrowest

---

else one would keep "warm and dry" in a downpour.  And the majority also raises, and leaves open, the possibility that the City's prohibition on the use of other "items necessary to facilitate sleeping outdoors"—such as "stoves," "fires," and makeshift "structures"—"may or may not be permissible."  *See* Opin. at 38–39, 47.  Second, the majority indirectly extends *Martin*'s holding from the strictly criminal context at issue in that case to civil citations and fines.  *See* Opin. at 35–38.  As the district court noted below, the parties vigorously debated the extent to which a "violation" qualifies as a crime under Oregon law.  The majority, however, sidesteps that issue by instead treating it as irrelevant.  The majority's theory is that, even assuming *arguendo* that violations of the anti-camping ordinances are only civil in nature, they are covered by *Martin* because such violations *later* could lead (after more conduct by the defendant) to criminal fines, *see* Opin. at 38.  But the majority does not follow the logic of its own theory, because it has not limited its holding or remedy to the enforcement of the ultimate criminal provisions; on the contrary, the majority has enjoined *any* relevant enforcement of the underlying ordinances that contravenes the majority's understanding of *Martin*.  *See* Opin. at 49.

grounds.'"   430 U.S. at 193 (emphasis added) (citation omitted).  Under a correct application of *Marks*, the holding of *Powell* is that there is no constitutional obstacle to punishing conduct that has *not* been shown to be involuntary, and the converse question of what rule applies when the conduct *has* been shown to be involuntary was left open.  *See Martin*, 920 F.3d at 590–93 (M. Smith, J., dissenting from denial of rehearing en banc) (explaining that, under a proper application of *Marks*, "'there is definitely no Supreme Court holding' prohibiting the criminalization of involuntary conduct" (citation omitted)).

Moreover, the correct answer to the question left open in *Powell* was the one provided in Justice Marshall's plurality opinion in that case: there is no federal "constitutional doctrine of criminal responsibility."  392 U.S. at 534.  In light of the "centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds," including the "doctrines of *actus reus*, *mens rea*, insanity, mistake, justification, and duress," the "process of adjustment" of "the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man" is a matter that the Constitution leaves within "the province of the States" or of Congress.  *Id*. at 535–36. "There is simply no indication in the history of the Eighth Amendment that the Cruel and Unusual Punishments Clause was intended to reach the substantive authority of Congress to criminalize acts or status, and certainly not before conviction," and the later incorporation of that clause's protections vis-à-vis the States in the Fourteenth Amendment "worked no change in its meaning."  *Martin*, 920 F.3d at 602 (Bennett, J., dissenting from denial of rehearing en banc); *see also id*. at 599 (explaining that

*Martin*'s novel holding was inconsistent with the "text, tradition, and original public meaning[] [of] the Cruel and Unusual Punishments Clause of the Eighth Amendment"). Consequently, so long as "the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*," the Eighth Amendment principles applied in *Robinson* have been satisfied. *Powell*, 392 U.S. at 533 (plurality). The Eighth Amendment does not preclude punishing such an act merely "because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.'" *Id*.; *see also Martin*, 920 F.3d at 592 n.3 (M. Smith, J., dissenting from denial of rehearing en banc) ("*Powell* does not prohibit the criminalization of involuntary conduct.").

Further, it is hard to deny that *Martin* has "generate[d] dire practical consequences for the hundreds of local governments within our jurisdiction, and for the millions of people that reside therein." *Id*. at 594 (M. Smith, J., dissenting from denial of rehearing en banc). Those harms, of course, will be greatly magnified by the egregiously flawed reconceptualization and extension of *Martin*'s holding in today's decision, and by the majority's equally troubling reworking of settled class-action principles. With no sense of irony, the majority declares that no such harms are demonstrated by the record in this case, even as the majority largely endorses an injunction effectively requiring Grants Pass to allow the use of its public parks as homeless encampments. Other cities in this circuit can be expected to suffer a similar fate.

In view of all of the foregoing, both *Martin* and today's decision should be overturned or overruled at the earliest

opportunity, either by this court sitting en banc or by the U.S. Supreme Court.

\*      \*      \*

I respectfully but emphatically dissent.